1  **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8
   Martin Soto Fong,                    )    No. CV 04-68-TUC-DCB
9                                        )
              Petitioner,                )
10                                       )
   vs.                                   )
11                                       )    **ORDER AND MEMORANDUM**
                                         )    **OF DECISION**
12 Charles Ryan, et al.,                 )
                                         )
13            Respondents.               )
                                         )
14 _____     )

15
           Before the Court is Petitioner Martin Fong's Petition for Writ of Habeas Corpus,
16
   which has been amended twice, corrected, and supplemented.  (Docs. 1, 43, 92, 94, 229.)[1]
17
   For the reasons set forth herein, the Court concludes that Petitioner is not entitled to habeas
18
   corpus relief.
19
                            **PROCEDURAL HISTORY**
20
           In 1993, Petitioner was convicted by a jury of three counts of first degree murder,
21
   robbery, attempted armed robbery, aggravated robbery, and attempted aggravated robbery
22
   arising from a triple homicide at the El Grande Market in Tucson.  In a subsequent trial, a
23
   separate jury convicted Petitioner's co-defendants, Christopher McCrimmon and Andre
24
   Minnitt, of similar charges.
25

26 ─────────────────
           [1]     "Doc." refers to documents in this Court's file. Beginning with Document 60,
27 pinpoint references to documents are to the page numbers assigned by the electronic filing
   system. For exhibits attached to electronically-filed documents, the Court also provides
28 parallel pinpoint references to the exhibit's original page number.

Petitioner and his co-defendants each were sentenced to death for the murders and to prison terms for the other offenses. On appeal, the Arizona Supreme Court affirmed Petitioner's convictions and sentences, *State v. Soto-Fong*, 187 Ariz. 186, 928 P.2d 610 (1996), *cert. denied*, 520 U.S. 1231 (1997), but reversed the convictions of McCrimmon and Minnitt and remanded for new trials on the ground of juror coercion, *State v. McCrimmon*, 187 Ariz. 169, 927 P.2d 1298 (1996).[2] Thereafter, Petitioner filed a petition for postconviction relief (PCR) pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. Following an evidentiary hearing, the trial court denied relief. The Arizona Supreme Court summarily denied a petition for review.

In 2004, Petitioner initiated the instant federal habeas corpus proceeding, and the Court stayed his execution and appointed counsel. Two months after counsel filed an amended petition, the Supreme Court ruled in *Roper v. Simmons*, 543 U.S. 551 (2005), that the Eighth Amendment prohibits the execution of juvenile offenders. Because it was undisputed that Petitioner was 17 years old at the time of the offenses, the Court stayed this proceeding to enable him to return to state court to seek relief from his capital sentence based on *Roper* and to exhaust new claims raised in the amended petition relating to actual innocence and a Vienna Convention violation. (Doc. 55.)

In 2006, the Pima County Superior Court vacated Petitioner's capital sentences, resentenced him to three consecutive terms of 25 years to life for the murder convictions, and denied relief on the remaining postconviction claims. Petitioner appealed his new sentence and sought discretionary review of the denial of his second PCR petition. In May 2007, the Arizona Court of Appeals issued a consolidated ruling denying Petitioner's appellate and PCR claims. Thereafter, the Arizona Supreme Court summarily denied review.

In October 2008, this Court lifted its stay and permitted one of Petitioner's appointed counsel to continue representation. (Doc. 80.) A second amended petition and responsive

---

[2] Petitioner has clarified that his surname is Fong, not Soto-Fong, as identified in state court filings. (Doc. 94 at 1 n.1.)

briefs followed.  In October 2010, following completion of a third state PCR petition, the Court authorized Petitioner to supplement his habeas petition with additional newly exhausted claims.  Respondents then filed a supplemental response to the new claims, and Petitioner filed a reply.

**FACTUAL BACKGROUND**

**Investigation and Trial**

At 10:15 p.m. on June 24, 1992, police were dispatched to the El Grande Market in response to a 911 call.  There, they found the bodies of Fred Gee, Ray Arriola, and Zewan Huang, all employees of the market.[3]  Gee had been shot in the head and torso with a .25 caliber handgun.  Arriola and Huang had been shot in the head with a .38 caliber weapon and in the torso with a .25 caliber weapon.

Shortly thereafter, police found an abandoned car that was parked out of place several blocks from the market.  Tire tracks indicated an abrupt stop, and the engine was still warm.  Christopher McCrimmon's fingerprint was found on the driver's side window.  The car belonged to David Durbin, who had lent it to his girlfriend, Queen E. Ray.  The morning after the shootings Ray initially told Durbin it had been impounded for unpaid parking tickets.  She told the lead homicide investigator, Tucson Police Detective Joseph Godoy, that she had driven a friend to some apartments, experienced mechanical problems, and abandoned the car.  Months later, on the eve of a preliminary hearing for McCrimmon and Andre Minnitt, Godoy confronted Ray about the truthfulness of her statement and told her she would be charged with perjury if she lied on the witness stand.  At the hearing, Ray testified that on the night of the market shooting, she had loaned McCrimmon the car in return for money.  She said that McCrimmon, Minnitt, and a third person, whom she knew as Martinez, left McCrimmon's apartment with the car around 10:00 p.m. and that about an hour later the

_____

[3]     The facts set forth herein are derived from the Court's review of the state court record as well as the Arizona Supreme Court's opinions in *Soto-Fong*, 187 Ariz. at 190-91, 928 P.2d at 614-15, and *State v. Minnitt*, 203 Ariz. 431, 433-34, 55 P.3d 774, 776-77 (2002).

- 3 -

three returned without the car. McCrimmon gave Ray $30 and the car keys. During trial, Ray, who had seen pictures of Petitioner on television following his arrest, identified Petitioner as "Martinez."

At the time of the murders, the market was in the process of closing. Two registers had been cleared, leaving only one open. The body of the manager, Fred Gee, was found at the open register at the liquor counter. The register had a $1.69 sale rung up on it, and nearby on the counter were produce bags containing a cucumber and three lemons. Petitioner's fingerprints were found on each bag. On the floor near Gee's body were two crumpled $1 food stamps, not yet stamped with the market's name. Petitioner's fingerprints were also found on one of these food stamps. At least $175.52 was missing from the store. Testimony at trial indicated that Gee routinely permitted known customers through the iron security gate after the store's 9:00 closing time.

The investigation took a significant turn on August 31, 1992, when Detective Godoy received a tip from an anonymous caller and obtained information from a confidential informant working with Gang Unit Sergeant Zimmerling. From these sources, Godoy gleaned the name "Martin Soto," along with that of Christopher McCrimmon. A background check revealed that Soto and Fong were the same person. Godoy also learned from the Gee Family that Martin Fong was a former market employee.

Around this same time, Tucson Police Detective Fuller began investigating an August 26, 1992, robbery and non-fatal shooting at Mariano's Pizza. McCrimmon became a potential suspect after forensic evidence linked him to the crime scene. Fuller discovered that Minnitt also may have been involved in the robbery and relayed this information to Godoy on September 1. At that point, McCrimmon was already a suspect for the market murders. With the additional information connecting McCrimmon and Minnitt, Godoy considered Minnitt a possible suspect. Moreover, according to Fuller, McCrimmon and Martin Soto Fong were close friends. On September 2, McCrimmon and Minnitt were arrested for the pizzeria robbery and in the days that followed Godoy tried to locate

Petitioner.

Also in late August, Keith Woods, a close friend of McCrimmon's, was released from prison. On August 30, Tucson police arrested him on drug charges. Because Woods was already a three-time felon, and possessing drugs was a parole violation subjecting him to a possible twenty-five year prison sentence, he agreed to become an informant in exchange for release and dismissal of the drug charges. On September 8, following an initial 30 to 45-minute untaped conversation, Godoy created a ruse to move Woods into a wired room. While being surreptitiously recorded, Woods told Godoy that on the day he was released from prison McCrimmon and Minnitt told him they committed the El Grande murders along with a third person, Cha-Chi, a Mexican guy, who had worked at the market and set up the robbery. Woods also said they told him Cha-Chi went into the store by himself "masked down or whatever," someone rebelled, and Cha-Chi shot them with a .25 caliber gun. (Doc. 45, Ex. 43 at 5.) McCrimmon and Minnitt then ran in, and the latter shot two of the victims after they were already down. Woods initially denied ever meeting or knowing Cha-Chi but in a later statement to Godoy on November 20 Woods said Cha-Chi was a guy named Martin, who was Betty Christopher's boyfriend. There was no dispute at trial that Petitioner was Betty Christopher's boyfriend.

Using an outstanding juvenile runaway complaint filed by Petitioner's mother, police finally found, arrested, and fingerprinted Petitioner on September 9, the day after Woods made his initial statement. In response to questioning, Petitioner denied any involvement in the crime, claiming that he had last been in the store about two weeks before the murders to buy beer. The next day, Godoy learned of Petitioner's fingerprint match to items found at the crime scene, and Petitioner was re-arrested.

Petitioner's trial took place before that of his co-defendants. The prosecution theorized that Fong was recognized by market employees, permitted to enter the store during closing, filled plastic bags with lemons and a cucumber, and paid Gee at the liquor counter register with two $1 food stamps before the shooting began. The defense theory was one of

mistaken identity: Petitioner claimed Cha-Chi was Martin Garza, another acquaintance of McCrimmon's. The defense also maintained that investigators improperly handled the forensic evidence, making the fingerprints inherently unreliable. Further, the defense called Keith Woods as a witness to support the theory that Detective Godoy improperly coerced both Woods and Ray to implicate Fong.

**Co-Defendant Retrials**

After their convictions were reversed due to juror coercion, the trial court severed the retrials of McCrimmon and Minnitt. Minnitt's initial retrial resulted in a hung jury. *See State v. Minnitt*, 203 Ariz. 431, 433, 55 P.3d 774, 777 (2002). He was tried again in 1999, found guilty of all charges, and resentenced to death for the murders. *Id.*

On appeal, the Arizona Supreme Court determined that Minnitt's third trial should have been barred by principles of double jeopardy resulting from prosecutorial misconduct at the first two trials. *Id.* Specifically, the court found that the prosecutor, Kenneth Peasley, knowingly elicited false testimony from Detective Godoy concerning how and when McCrimmon, Minnitt, and Fong became suspects in the market murders. The court recounted the following relevant facts:

> In all three Minnitt trials and in both McCrimmon trials, the state's case depended heavily on Keith Woods' credibility. Importantly, as of September 2, the police had identified Soto-Fong, McCrimmon, and Minnitt as suspects in the El Grande crimes and had interviewed them. But according to Godoy, police had yet to interview anyone who could provide direct evidence linking any of the three to the crimes. Woods was not interviewed until September 8, six days after the McCrimmon and Minnitt interviews. Godoy claimed to have received his first knowledge of any involvement by McCrimmon and Minnitt from his interview with Woods. This was the information the police were seeking – that McCrimmon and Minnitt had implicated themselves in the murders and that a witness would so testify.

> Woods' credibility was tenuous. He was a convicted felon and drug addict who entered into an agreement with the state to provide testimony to avoid a lengthy prison sentence. The state had no plausible explanation why Godoy conducted the untaped interview with Woods. The defense strategy in the Minnitt and McCrimmon trials was to show that Godoy was the source of Woods' information about Minnitt's and McCrimmon's involvement in the case, and that during the untaped interview, he fed that information to Woods. If Godoy was indeed the source, Woods' testimony would not have helped the state. Similarly, without Woods, the state's case would be significantly weakened because no direct or physical evidence connected Minnitt to the

crime, and the credibility of the remaining witnesses was questionable.
*Id.* at 434-35, 55 P.3d at 777-78.

Peasley was aware Godoy had begun investigating McCrimmon, Minnitt, and Fong before Godoy first met with Woods. Nonetheless, during the initial 1993 joint trial, Peasley repeatedly told the jury and elicited from Godoy information to the contrary—that police did not have the suspects' names until after Godoy interviewed Woods on September 8, 1992—thus bolstering Woods's credibility. Peasley repeated this conduct during Minnitt's 1997 retrial, asking the detective "a series of questions designed to erase any doubt that the source of Godoy's information could have been anyone but Woods." *Id.* at 436, 55 P.3d at 779. One week after the jury in Minnitt's initial retrial failed to reach a verdict, McCrimmon's retrial began. By this time McCrimmon's defense counsel had learned of Godoy's false testimony and vigorously pursued the issue. During McCrimmon's trial, Godoy admitted he testified falsely at Minnitt's trial because he feared causing a mistrial by revealing information obtained from a confidential informant. The jury ultimately acquitted McCrimmon on all charges.

Based on his misconduct in the McCrimmon and Minnitt trials, Peasley was later disbarred from the practice of law. *In Re Peasley*, 208 Ariz. 27, 90 P.3d 764 (2004).

**Postconviction Proceedings**

On direct appeal, Fong was represented by his trial attorney, James Stueringer. After the Arizona Supreme Court denied appellate relief on August 19, 1996, Stueringer sought certiorari in the United States Supreme Court. That petition was denied on May 19, 1997. *Soto-Fong v. Arizona*, 520 U.S. 1231 (1997). In February 1998, Stueringer's son was arrested in Ohio for various criminal offenses. (Doc. 46, Ex. 61.) Stueringer asked Peasley, the prosecutor in Fong's case, for assistance, and Peasley ultimately wrote a letter to an Ohio judge in June 1998 urging probation for Stuehringer's son. (Doc. 46, Ex. 60.) Around this same time, Stuehringer, acting *pro bono*, wrote a letter defending Peasley against charges of ethical misconduct lodged with the state bar by McCrimmon's defense lawyer. On

December 17, 1998, the Arizona Supreme Court issued its mandate in Petitioner's case and appointed new counsel to represent him in postconviction proceedings. In May 2000, the State Bar of Arizona filed a formal complaint against Peasley and the Pima County Attorney hired Stueringer to defend Peasley in the disciplinary proceeding. (Doc. 46, Exs. 62, 63.)

On August 20, 1999, Petitioner filed his first state PCR petition raising numerous claims, including prosecutorial misconduct based on alleged perjured testimony from Detective Godoy concerning his investigation of Petitioner. He also raised several claims of ineffective assistance of counsel (IAC), challenging *inter alia* Stueringer's failure to retain an identification expert, failure to call Petitioner as a witness, failure to challenge Godoy's testimony both during trial and on appeal, and decision to call Keith Woods as a witness. In supplemental filings dated November 13, 2000, and July 9, 2001, Petitioner added claims alleging conflict of interest arising from Stueringer's representation of Peasley in the state bar proceedings and a violation of *Brady v. Maryland* from the prosecutor's failure to disclose one of Godoy's reports. All told, Petitioner raised 35 claims in his PCR petition.

In August 2000, the State Bar of Arizona sought clarification concerning Stuehringer's representation of Peasley in light of Stuehringer's role as Petitioner's trial counsel. (Doc. 183-1 at 95, Ex. 129.) In January 2001, the state bar hearing officer found no conflict because the allegations in Peasley's disciplinary case arose from his conduct in the trials of McCrimmon and Minnitt, not Petitioner. (Doc. 184-1 at 88-90, Ex. 131 at 4-6.) The officer further ordered that Stuehringer could not be called as a witness and that it was unclear how any confidential communications between Petitioner and Stuehringer could relate to Peasley's conduct in prosecuting McCrimmon and Minnitt. (*Id.*)

In January and August 2001, Pima County Superior Court Judge Gordon Alley, serving in place of the deceased trial judge, held evidentiary hearings on Petitioner's ineffectiveness claims. (Doc. 144-1 at 2, Ex. U; Doc. 144-2 at 2, Ex. V; Doc. 195-1 at 58, Ex. 170.) Because Godoy was under indictment for perjury stemming from the McCrimmon and Minnitt trials, he invoked his rights under the Fifth Amendment and refused to testify.

- 8 -

Stuehringer testified as to his defense strategy, and the court also heard testimony from several other witnesses, including Peasley, regarding the alleged *Brady* and prosecutorial misconduct violations.

Judge Alley unexpectedly died prior to ruling on Petitioner's claims. Judge Clark Munger was reassigned to the case, and the parties agreed that approximately half of Petitioner's claims could be decided without further evidentiary development. In June 2002 the state court issued a 34-page ruling addressing those claims. (Doc. 144-3 at 120, Ex. X.) At Petitioner's request the court held another evidentiary hearing in August 2002 on the remaining claims. (Doc. 144-3 at 2, Ex. W.) However, Petitioner did not present any new witnesses. Stuehringer, Peasley, and two other witnesses provided testimony substantially similar to that given at the 2001 hearing. Although no longer under indictment, Godoy was not called as a witness. In October 2002, the court issued a 29-page ruling rejecting the remaining claims. (Doc. 144-3 at 152, Ex. Y.)

Following this Court's order staying federal habeas proceedings pending resentencing in light of *Roper* and exhaustion of new claims relating to actual innocence and a Vienna Convention violation, Petitioner's federal habeas counsel were appointed as counsel for Petitioner by the state court and filed a second PCR petition raising (and re-raising) numerous claims. The actual innocence claim was based primarily on a January 2005 article from *The New Yorker* magazine which contained a summary of a statement by an alleged new witness, Carole Grijalva-Figueroa, who claimed she was the "lookout" during the El Grande Market robbery and that Petitioner, McCrimmon, and Minnitt were not involved. (Doc. 47, Ex. 67.) In mid-2005, the state court vacated Petitioner's death sentence, summarily dismissed the majority of Petitioner's successive PCR claims on procedural grounds, and directed Petitioner to obtain an affidavit from Grijalva-Figueroa to substantiate the innocence allegation. (Doc. 146-2 at 126, Ex. PP.) In January 2006, the court denied relief when Petitioner failed to produce any supporting evidence. (Doc. 146-3 at 27, Ex. UU.) The Arizona Court of Appeals affirmed. *State v. Soto-Fong*, No. 2 CA-CR 2006-0091

& No 2 CA-CR 2006-0056-PR (consolidated) (Ariz. App. May 3, 2007) (unpublished memorandum decision). (Doc. 146-3 at 67, Ex. WW.)

Subsequently, Petitioner filed a third PCR petition in state court, again asserting an actual innocence claim and requesting leave to conduct discovery. (Doc. 232-1 at 12, Ex. B.) In May 2009, the PCR court denied discovery and dismissed the petition, finding the claims precluded because they had been addressed previously. (Doc. 232-1 at 57, Ex. E.) Accepting a discretionary petition for review, the court of appeals denied relief. *State v. Soto-Fong*, No. 2 CA-CR 2009-0294-PR, 2010 WL 1138956 (Ariz. App. Mar. 25, 2010) (unpublished memorandum decision). (Doc. 232-1 at 93, Ex. G.)

## STANDARD OF REVIEW

Because Petitioner initiated this habeas proceeding after the effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), relief can be granted on claims denied on the merits only if the state court's adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In conducting review under § 2254(d)(1), this Court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

## DISCUSSION

Petitioner asserts 24 claims for relief, many of which have numerous sub-parts. Respondents concede exhaustion as to some of the claims, either in whole or in part, and assert procedural defenses as to others. Petitioner seeks discovery, expansion of the record, or an evidentiary hearing as to the majority of his claims.

## I.     CLAIM A:  PROSECUTORIAL MISCONDUCT

Petitioner asserts that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by prosecutorial misconduct. He divides the specific allegations

underlying this claim into three categories: (1) Testimonial Evidence; (2) Physical Evidence; and (3) Confrontation, Abuse of Process & Other Misconduct. Each of these categories contain multiple allegations. Petitioner also asserts deprivation of his rights based on the cumulative effect of the alleged misconduct.

## A. Testimonial Evidence

Prosecutorial misconduct will rise to a constitutional violation warranting federal habeas relief only if such conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court held "that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." To prevail on a *Napue* claim, Petitioner must show that (1) the testimony was actually false, (2) the prosecution knew or should have known that the testimony was false, and (3) the false testimony was material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc). False testimony is material if there is "any reasonable likelihood that [it] could have affected the judgment of the jury," in which case the conviction must be set aside. *United States v. Agurs*, 427 U.S. 97, 103 (1976). "Under this materiality standard, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (quotation omitted).

### 1. Keith Woods

Petitioner asserts that the prosecution failed to disclose a report by a Detective Nunez indicating that the prosecutor, Kenneth Peasley, was waiting with Detective Godoy when arresting officers brought Keith Woods into the police station on November 20 and that Peasley was present during the untaped portion of Woods's statement that day. Petitioner next alleges that Peasley and Godoy coached Woods to correct inconsistencies from his earlier September 8 statement, including for the first time linking "Cha-Chi" to Petitioner.

From this, Petitioner argues that Peasley committed misconduct by knowingly using Woods's "false" testimony at trial. (Doc. 94 at 84.)

Respondents assert that this aspect of Claim A was not properly exhausted. Because the claim is meritless, the Court declines to reach this issue. *See* 28 U.S.C. § 2254(b)(2) (allowing denial of unexhausted claims on the merits); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

Petitioner does not identify or reference the specific parts of Woods's testimony that are allegedly false. Although Petitioner characterizes Woods as the "state's leading witness" (Doc. 94 at 84), Woods was called as a witness at Petitioner's trial by the defense, not, as in the McCrimmon and Minnitt trials, by the prosecution. (Doc. 147-2 at 4, Ex. DDD (RT 10/15/93) at 3.). On cross-examination by Peasley, Woods confirmed his September 8 statement to Godoy that McCrimmon and Minnitt said Cha-Chi, a former market employee, had set up the robbery. (*Id.* at 60, Ex. DDD at 59.) Woods also testified to his November 20 statement, in which he for the first time described Cha-Chi as "Martin" and "Betty Christopher's boyfriend." (*Id.* at 60-61, Ex. DDD at 59-60.) After detailing his conversation with McCrimmon and Minnitt, Peasley asked Woods to confirm a pretrial interview with Stuehringer, during which Woods said he had assumed Cha-Chi wore a mask because it was a robbery, not because McCrimmon and Minnitt actually mentioned a mask. Woods also denied that Godoy ever told him what to say, suggested he lie, or threatened him to provide a particular statement. (*Id.* at 69, Ex. DDD at 68.)

In these proceedings, Petitioner, relying on a declaration signed by Woods on August 11, 2005, asserts summarily that Woods "now admits his testimony was false and coerced." (Doc. 94 at 31.) The declaration states in part that Woods "did not know who Martin Soto Fong or 'Cha-Chi' was until Detective Godoy told me they were the same person," that Godoy met with him "at least 10 times before trial," and that he learned for the first time from Godoy that "Cha-Chi worked at the El Grande Market." (Doc. 93-2 at 205, Ex. 98 at 1.) Woods also states that he met with Peasley, who told him portions of his story "were

mixed up or wrong" and that Peasley would "correct" him. (*Id.* at 206, Ex. 98 at 2.)

Although not entirely clear, it appears Petitioner's claim of "false testimony" rests on an allegation that Woods's November 20 statement to police is itself false and thus Peasley's cross-examination of Woods concerning this statement amounted to misconduct. (*See* Doc. 181 at 232 n.72.) Although the November statement does not contradict the September statement in any significant manner, it does include the additional "Martin" and "Betty Christopher's boyfriend" details that more directly implicated Petitioner. In his declaration, Woods now claims, "The person that originally told me about what happened inside the El Grande told me 'Cha-Chi' was involved but did not otherwise identify him in any way.'" (Doc. 93-2 at 206, Ex. 98 at 2.) However, Woods does not assert that Godoy or Peasley coached or coerced him to provide the additional identifying details about Cha-Chi during the November interview.[4] Woods does claim that Peasley said he would "correct" him, but the declaration does not state whether the meeting with Peasley was in regard to Woods's testimony at the McCrimmon and Minnitt preliminary hearing and trial or in preparation for Woods's recorded statement on November 20. Finally, although Woods now says it was Godoy who first told him Cha-Chi was a former market employee, this was not a new detail revealed during the November interview; rather, Woods made that assertion in his initial September statement.

Petitioner's claim is highly speculative. While Woods's declaration implies that the additional identifying information about Cha-Chi provided in the November statement did not come from McCrimmon or Minnitt, it does not directly implicate either Godoy or Peasley. Thus, even assuming Woods's testimony on cross-examination regarding his

---

[4]        Petitioner also provides a transcript of a December 2004 interview with Tanisha Price Woods, who at the time of the murders was Keith Woods's girlfriend. Without elaboration, Price Woods claims Godoy "would just like feed [Keith] information." (Doc. 47, Ex. 88, at 7.) However, Keith Woods's declaration post-dates the interview with Price Woods, and he does not assert therein that Godoy told him to provide the additional identifying details about Cha-Chi, which is the allegation before this Court.

November 20 statement was false, Petitioner's claim fails because he has not alleged sufficient facts demonstrating that the prosecution knew or should have known of the alleged falsity.

### 2. Detective Godoy

Petitioner argues that the prosecution knowingly suborned false testimony from Detective Godoy as to when Petitioner, McCrimmon, and Minnitt first became suspects.[5] (Doc. 94 at 85.) Petitioner raised this claim in his first PCR petition. (Doc. 143-2 at 19-30, Ex. J at 16-27.)

Background

In a report dated September 15, 1992, Godoy described receiving on August 31 a call from an anonymous tipster, who claimed a black man named "McKinney" and another person nicknamed "Cha-Chi" were involved in the market murders. (Doc. 93-1 at 30, Ex. 26 at 1.) This report further stated that Godoy received a second call on August 31 from Sgt. Zimmerling, who relayed that a reliable confidential informant told him the murders were committed by a young black male named Christopher McCrimmon and a Mexican male named Martin Soto, also known as Cha-Chi. (*Id.* at 30-31, Ex. 26 at 1-2.) The report then stated Godoy spoke with the Gee family and learned of an ex-employee named Martin Fong, who had worked at the market during the summer of 1991. (*Id.* at 31, Ex. 26 at 2.)

In a separate report dated September 9, 1992, apparently prepared for the Mariano's Pizza case, Godoy reported that the August 31 anonymous caller told him to look for "Martin Soto and a black guy named McKinney." (Doc. 46, Ex. 54 at 1.) This report then states that Sgt. Zimmerling's confidential informant gave him the names Cha-Chi and McCrimmon, and that Godoy learned from the Gang Unit that Martin Fong went by "Cha-Chi" and was an associate of McCrimmon's. Because the reports are inconsistent, Godoy's source of the

---

[5] Petitioner also argues that Peasley improperly vouched for Godoy's credibility in closing argument. That issue is addressed in Section I.C below along with Petitioner's other allegations of misconduct in closing argument.

name "Martin Soto" is unclear.

Prior to trial, defense counsel Stuehringer interviewed Sgt. Zimmerling as well as Detective Cuestas and Officer Cruze from the Gang Unit. Zimmerling stated that his confidential informant described the perpetrators as Chris McCrimmon and a Mexican kid by the name of Martin or Cha-Chi. (Doc. 93-2 at 160, Ex. 76 at 7.) Cuestas denied knowing Cha-Chi's identity and said Godoy had not asked him whether Cha-Chi was Martin Fong. (Doc. 45, Ex. 46.) In response to Cuestas's inquiry, Cruze said he was not familiar with anyone named Cha-Chi. (Doc. 93-2 at 5, Ex. 71 at 4.)

During Godoy's first day of direct trial testimony, the following exchange occurred:

> Q. What I'm going to do is this: Ask you to focus on the time period of June 24th until the end of August of 1992. During that time period, had you developed any information up to the end of August, had you developed any information that would lead you to believe that either Christopher McCrimmon, Andre Minnitt, or Martin Fong were suspects in the killings of these three men at the El Grande Market?
>
> A. No, sir.

(Doc. 187-1 at 183, Ex. 147 (RT 10/19/93) at 100.) The next day, during cross-examination, Stuehringer asked Godoy about Keith Woods's September 8 statement:

> Q. In the course of that statement is when you learn about Mr. McCrimmon and Mr. Minnitt?
>
> A. Yes.
>
> Q. And this third person named Cha-Chi?
>
> A. That's correct.

(Doc. 148-1 at 62-63, Ex. FFF (RT 10/20/93) at 61-62.) Stuehringer also elicited from Godoy that sometime between late June and late August Petitioner had been identified by the Gee family as a former employee. (*Id.* at 59, Ex. FFF at 58.)

On re-direct, Peasley asked Godoy about his contacts with the Gee family, and Godoy testified that he spoke to them a couple of times that summer and specifically asked about Petitioner after he became a focus of the case during the first week of September. (*Id.* at 88-89, Ex. FFF at 87-88.) Peasley then sought to question Godoy about how he had first gotten

Petitioner's name, which prompted Stuehringer to object to admission of information obtained from an anonymous source. (*Id.* at 91, Ex. FFF at 90.) After the objection was overruled, Peasley continued:

> Q.    Sir, I was asking you about your conversation with Sergeant Zimmerling of the Tucson Police Department. When was it that you actually spoke with Sergeant Zimmerling?
>
> A.    The exact date I believe was August 31st.
>
> . . . .
>
> Q.    Without going into the nature of the information, did Sergeant Zimmerling give you information that you thought was pertinent to this particular case?
>
> MR. STUEHRINGER: Judge, May I just have a continuing objection?
>
> THE COURT: Yes, you may.
>
> THE WITNESS: Yes.
>
> Q.    Was it after your conversation with Sergeant Zimmerling that you contacted the Gees and made inquiry about employment records?
>
> A.    Yes.

(*Id.* at 92-93, Ex. FFF at 91-92.)

In his first PCR petition, Petitioner asserted that Godoy had committed perjury at trial by claiming Petitioner had not been a suspect until after the September 8 Woods interview. (Doc. 143-2 at 19-20, Ex. J at 16-17.) He later added a claim that Godoy's September 9 report had never been disclosed and thus Stuehringer had been unaware of Godoy's false avowals that Zimmerling and the Gang Unit had identified Cha-Chi as Martin Soto Fong.[6] (Doc. 139, Ex. Q at 8.)[7] After reviewing the trial record and holding an evidentiary hearing, the state court denied relief:

> Petitioner/defendant's argument is premised upon a finding that

---

[6]    The alleged disclosure violation is addressed as part of Claim B in Section II below.

[7]    Respondents provided the Court a courtesy copy of Exhibit Q, but neglected to file it electronically. (*See* Docs. 140-48.)

Detective Godoy perjured himself. The knowing use of perjured testimony on a critical issue is sufficient to require a new trial. *U.S. v. Young*, 17 F.3d 1201 (9th Cir. 1994); *State v. Razinha*, 123 Ariz. 355, 599 P.2d 808 (1979 Div 2).

Initially, the Petitioner/defendant argues Det. Godoy provided the following perjured testimony:

a) Woods was his initial source for the names of Minnett [sic], McCrimmon and Soto-Fong, and

b) These three men had not been suspects before they were named by Woods on September 8, 1999.

Subsequently, Petitioner/defendant states the perjury consisted of Det. Godoy's testimony:

a) that Soto-Fong had not been a suspect in the El Grande case until Godoy interviewed Keith Woods on September 8, 1992, and

b) that Godoy had conducted no investigation into Soto-Fong until that date.

The perjury analysis of Petitioner/defendant's claim must focus on Det. Godoy's exact testimony rather than Petitioner/defendant's paraphrase or summarization of Det. Godoy's testimony.

Perjury is defined by statute in Arizona Revised Statutes 13-2702. Petitioner/defendant also asserts Det. Godoy admitted that he committed perjury as to these two statements. However, no references are given to transcripts of Det. Godoy's admission of perjury in *State v. Soto-Fong*. The State denies Det. Godoy made any such admissions. The court could not find any admission by Det. Godoy that he committed perjury in *State v. Soto-Fong*. The court is unaware of any judicial or administrative proceeding in which Det. Godoy's testimony in this case was determined to be perjury.

1) As to Det. Godoy's testimony on October 19, 1993, on page 100, lines 8 - 16:[8] Petitioner/defendant concedes "This, technically was true (although misleading) . . ." If technically true it is not perjury as it is not false. . . .

2) As to Det. Godoy's testimony on October 20, 1993, starting on page 61: Petitioner/defendant focuses on Det. Godoy's testimony on October 20, 1993, beginning on page 61 at line 22 and continuing through page 62 line 18. Specifically, there appear to be two questions by Mr. Stuehringer concerning what happened at the September 8, 1992 meeting with Keith Woods and Det. Godoy's responses that might be objectionable:

Beginning at page 61, line 22:

---

8        See *supra* the quotation on page 15 of this order.

"Q. In the course of that statement is when you learn about Mr. McCrimmon and Mr. Minnitt?
A. Yes.
Q. And this third person named Cha-Chi?
A. That's correct.
Q. I think you testified earlier this afternoon that after September 8th, your next contact with Mr. Woods wasn't until November 20th?
A. That's correct.
Q. So whatever information you had that you testified to between September 8th and November 20th came from that September 8th session?
A. Yes."

However, the court must consider Det. Godoy's entire testimony rather than take individual parts out of the context of the whole. Det. Godoy did not state that he had not heard of those three names before the September 8. On cross-examination Det. Godoy testified that somewhere in late June to late August time frame Det. Godoy had contact with members of the Gee family and asked them to supply names of present and former employees, and sooner or later found that Mr. Fong was a former employee. On re-direct, Det. Godoy was asked further about the information from the Gee family. Just as the prosecutor was delving into the very concern Petitioner/defendant now raises, the defense counsel objected to the question. A vigorous exchange took place between the prosecutor and defense counsel as to admissibility of Sgt. Zimmerling's information and other sources that implicated Mr. Soto-Fong. The prosecutor was attempting to elicit the information Petitioner/defendant now says Det. Godoy did not disclose. Det. Godoy could not testify in narrative form but must respond to direct questions. If the questions to elicit the information concerning the contents of the September 9, 1992 and September 15, 1992 reports were not asked, then Det. Godoy as the witnesses [sic] cannot be faulted. Defense counsel did not want to ask the questions and tried to stop the prosecutor when he asked the question. Of particular import as to the timing of the pre-September 8, 1992 information see the Trial Record for October 20, 1993, at page 91, line 21-25 in which Det. Godoy testified he received the information about Mr. Soto-Fong on August 31, 1992.

Det. Godoy has not been indicted regarding his testimony in *State v. Soto-Fong*. The court finds Det. Godoy did not commit perjury in his testimony.

False impression analysis:

Petitioner/defendant's position does not fail if Det. Godoy's testimony was not technically perjury as defined in ARS 13-2702 but leaves the jury with a false impression. A defendant's due process rights are violated when the State elicits and argues testimony which "taken as a whole" leaves the jury with a "false impression." *Alcorta v. Texas*, 355 U.S. 28 (1957), 78 S. Ct. 103.

If perjured or misleading testimony was given and defense counsel was able to expose the fallacy within the testimony then the testimony will no longer taint the verdict. The jury alone must weigh the testimony and the witnesses' credibility and decide what really happened. The courts will intercede only if the perjured or misleading testimony could not be challenged

- 18 -

because it was not known to be perjured or misleading and the defendant could not have exposed the state's error and the jury could not, therefore, have considered that aspect in its deliberations. Even then the court will not automatically grant a new trial where there has been perjury. *State v. Orantez*, 183 Ariz. 218, 902 P.2d 824 (1995). A defendant is not entitled to a new trial every time a witness is impeached by an inconsistent statement at trial, even if it is a critical witness testifying on a critical issue.

Petitioner/defendant's trial counsel interviewed Detectives Cuestas, Zimmerling and Cruze prior to the trial. Defense counsel knew of the inconsistency between Det. Godoy's reports and what he was told by the other officers. It was part of defense counsel's strategy to not have the jury focus on the reports or what Det. Godoy knew before September 8, 1992.

Petitioner/defendant's trial strategy is critical in this issue. Defense counsel knew of Det. Godoy's September 9, 1992 and September 15, 1992 reports but as a reasoned strategy did not want the jury to know of either of those reports. Both reports deal with information Det. Godoy had prior to September 8, 1992 concerning possible perpetrators, including the Petitioner/defendant. The portion of Det. Godoy's testimony that is now alleged to be offensive is in response to defense counsel's artful questioning which attempted to elicit what Keith Woods had told Det. Godoy on September 8, 1992, but avoid an answer that included information Det. Godoy had before September 8, 1992 from other sources. The Petitioner/defendant now attacks Det. Godoy for answering the question in the manner defense counsel wanted him to answer the question. He also attacks the prosecutor, Kenneth Peasley, for not asking questions about Det. Godoy's pre-September 8 knowledge when defense counsel did not want that information to go to the jury. In apparent contradiction, Petitioner/defendant agrees the prosecutor tried to bring in the evidence Det. Godoy had about the suspects prior to September 8, 1992. In fact, the prosecutor did ask questions to elicit that information, see Trial Record October 20, 1993, page 89, line 7-10.

In overly simplified terms defense counsel had two options in his defense strategy:

1) utilize the September 9 and September 15 reports and the initial unrecorded portion of the September 8, 1992 interview with Keith Woods to attempt to show what Det. Godoy knew prior to meeting with Keith Woods and that he first fed the confidential informant information regarding the Petitioner/defendant to Keith Woods in the unrecorded portion of the interview and then elicited that same information back from him in the recorded portion of the interview in return for not prosecuting him on the parol [sic] violation which would have resulted in a twenty-five year prison term for Keith Woods, or

2) try to keep the pre-September 8, 1992 information from the jury (which the defense counsel and the prosecutor felt was not admissible anyway) and emphasize the September 8, 1992 recorded interview with Keith Woods in which Keith Woods referred to the third perpetrator as a Mexican dude named ChaChi who was masked, tie the ChaChi reference to Martin Garza, an Hispanic, who knew one or both of the co-defendants and lived in a referenced neighborhood and went by the nickname ChaChi, and then either exclude the November 20, 1992 interview or attempt to show that the new information in

- 19 -

Keith Woods testimony as given in the November 20, 1992 interview was prompted by Det. Godoy and was a trade off for non-prosecution for the parol [sic] violation.

Defense counsel chose the second option after considered deliberation. It must be emphasized these were defense options and strategies NOT prosecution options or strategies. Petitioner/defendant now wants to blame the witness, Det. Godoy, and the prosecution for the defense strategy. If the defense counsel sought to keep out the two reports it was not incumbent upon the prosecution to make sure the jury knew of the reports.

New Evidence Analysis:

Petitioner/defendant seeks to expand this claim to include two distinct issues: 1) that perjured or misleading testimony violates due process and requires a new trial, and 2) that a witnesses' testimony or conduct in a subsequent trial of a co-defendant constitutes new evidence for purposes of impeachment. If Det. Godoy's testimony in *State v. Soto-Fong* was not perjury or otherwise constitutionally offensive then the question shifts to whether his testimony or conduct in the subsequent McCrimmon/Minnett [sic] trials was so offensive or inconsistent with his testimony in this case that it constitutes new evidence sufficient to warrant a new trial. Any such inconsistent evidence or conduct would only be to impeach Det. Godoy.

New impeachment evidence is not evidence that will be remedied by a new trial. Rule 32(1)(e)(3). *State v. Cooper*, 166 Ariz. 126, 800 P.2d 992 (1990 Div. 1).

The Petitioner/defendant's Rule 32 motion as to this claim is denied.

(Doc. 144-3 at 158-64, Ex. Y at 7-13 (footnotes omitted).)

Discussion

Petitioner asserts that the state court's ruling is based on both an unreasonable application of controlling federal law and an unreasonable determination of the facts under 28 U.S.C. § 2254(d). However, his argument with regard to unreasonable application of the law rests on the assertion that Godoy's testimony was false, Peasley knew it was false, and the testimony was material both substantively and to impeach Godoy's credibility. The Court therefore must first determine whether the state court's factual findings in this regard are objectively unreasonable. The Court concludes they are not.

Petitioner argues that Godoy's direct testimony was misleading because it implied that Godoy did not suspect Petitioner prior to August 31, when in fact Godoy noted in one of his reports that he had requested a list of former employees shortly after the murders and,

according to an interview with the author of *The New Yorker* article, had been searching for but kept missing Fong. (Doc. 181 at 71; *see* Doc. 93-1 at 174, Ex. 52 at 16; Doc. 47, Ex. 67 at 57.) Petitioner also argues that Godoy lied during cross-examination when he answered "yes" to Stuehringer's question of whether it was in the course of Woods's September 8 statement that he learned about McCrimmon, Minnitt, and Cha-Chi. (Doc. 181 at 71-72.) The Court disagrees.

The fact that Godoy may have had Fong's name on a list of former employees does not mean that Godoy suspected him of the murders at that point in the investigation. In *The New Yorker* article, Godoy stated only that he had been searching for Fong to either "make him or clear him" as part of his investigation of all the market's employees. (Doc. 47, Ex. 67 at 57.) The question posed at trial by Peasley was whether Godoy had "developed any information" prior to the end of August that led him to believe McCrimmon, Minnitt, or Fong were "suspects." (Doc. 187-1 at 183, Ex. 147 (RT 10/19/93) at 100.) As Petitioner acknowledged in his first PCR petition, Godoy's negative answer was technically correct. (Doc. 143-2 at 20, Ex. J at 17.) The state court's determination that Godoy did not commit perjury when he testified that Petitioner was not a suspect prior to August 31 was not objectively unreasonable.

Similarly, the state court's finding that Godoy "did not state that he had not heard of those three names before the [sic] September 8" also was objectively reasonable. (Doc. 144-3 at 160, Ex. Y at 9.) On cross-examination Godoy acknowledged that he "learn[ed] about" McCrimmon, Minnitt, and Cha-Chi in the course of Woods's September 8 statement; however, the question posed by Stuehringer did not specify what Godoy learned—i.e., their identities, their respective roles in the crime, etc.

The thrust of Petitioner's argument is that Godoy's cross-examination testimony left the jury "with the impression that Godoy received Martin Fong's name from Woods" on September 8. (Doc. 181 at 71.) However, Godoy testified on re-direct that Fong became a suspect on August 31, as a result of information obtained from Sgt. Zimmerling, not from any

statement by Woods.  In addition, Woods himself testified that McCrimmon and Minnitt never identified the third perpetrator as Martin Soto or Martin Fong, only as "Cha-Chi," "Martin," and "Betty Christopher's boyfriend."  (Doc. 147-2 at 60, Ex. DDD (RT 10/15/93) at 59.)  Therefore, the jury could not have been left with a false impression that Godoy obtained Petitioner's name from Woods.

Petitioner's case stands in sharp contrast to that of his co-defendants.  There, Woods testified for the prosecution that McCrimmon and Minnitt had confessed to him their role in the murders, and Godoy testified falsely that he did not have the suspects' names prior to meeting with Woods on September 8 (when in fact both had been questioned the week before).  Godoy also testified falsely at McCrimmon's and Minnitt's trial that he did not know a former employee was a participant in the murders until after the Woods interview, and Peasley repeated the falsehoods in both his opening statement and closing argument.  Godoy's testimony greatly bolstered Woods's credibility because the jury was left with the impression that Godoy knew nothing about McCrimmon, Minnitt, or Fong prior to meeting with Woods.  Given the absence of any other significant evidence implicating either McCrimmon or Minnitt in the market crimes, Woods was a critical prosecution witness.  Thus, Godoy's and Peasley's misconduct materially affected the defense's ability to argue that Woods was fed the defendants' names.  *See In Re Peasley*, 208 Ariz. at 30-31, 90 P.3d at 767-68; *Minnitt*, 203 Ariz. at 435, 55 P.3d at 778.

In this case, Woods was not a witness for the prosecution and did not testify to either hearing a confession from Petitioner or hearing Petitioner's name from McCrimmon or Minnitt.  Indeed, Woods affirmatively testified that neither of Petitioner's co-defendants used Petitioner's name.  Any possible misimpression from the brief exchange between defense counsel and Godoy that Godoy "learned" Petitioner's name from Woods was ameliorated on re-direct when Godoy testified that he had obtained Petitioner's name on August 31, over a week before first interviewing Woods.  Although Godoy testified falsely in the subsequent McCrimmon and Minnitt trial, the state court's determination that he did not do so in

Petitioner's case was not objectively unreasonable. 28 U.S.C. § 2254(d)(2). Consequently, the state court's denial of this claim was neither contrary to nor based on an unreasonable application of *Napue*. 28 U.S.C. § 2254(d)(1).

Because Petitioner has failed to satisfy either prong of § 2254(d), his requests for discovery, expansion of the record, and an evidentiary hearing are denied.[9] *See Pinholster*, 131 S. Ct. at 1398.

## B.     Physical Evidence

Petitioner contends that the State failed to follow proper protocol with respect to the forensic evidence, including failing to properly document evidence, mishandling evidence, failing to maintain chain of custody, and failing to generate reports contemporaneous with the processing of evidence. (Doc. 94 at 94.) He also states summarily that the fingerprint evidence in this case was fabricated. (*Id.*)

As Respondents note, although Petitioner recounted allegations of evidence mishandling in the factual background section of his first and second PCR petitions, he neglected to actually assert a prosecutorial misconduct claim based on these allegations. (*See* Doc. 143-2 at 62-71, Ex. J at 59-68; Doc. 146-2 at 44-45, Ex. MM at 22-23.) Similarly, Petitioner alleged in his "notice" of successive postconviction relief that the fingerprint evidence was fabricated (Doc. 146-2 at 89, Ex. OO at 11), but never asserted a prosecutorial misconduct claim on this basis in his second PCR petition. Thus, these allegations were not properly exhausted in state court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (noting that exhaustion requires fair presentation of both the operative facts and federal legal theory of a claim in a procedurally appropriate manner).

---

[9]     Petitioner argues he is entitled to develop this claim because the state court's evidentiary hearing was limited to his ineffectiveness claims and thus he never received a hearing on his prosecutorial misconduct allegations. (Doc. 94 at 114-15.) However, Judge Munger ruled in his June 27, 2002 order that an evidentiary hearing would be held with regard to 17 of Petitioner's claims, including prosecutorial misconduct. (Doc. 144-3 at 121, Ex. X at 2.) In addition, Peasley twice was called as a witness during the PCR hearings and questioned with regard to alleged misconduct.

When a petitioner has failed to fairly present a claim, it is the role of the federal court to determine if he has any available remaining remedies in state court. *Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998). In making that decision, the court must assess the likelihood that a state court will allow a determination on the merits of his claim. *Phillips v. Woodford*, 267 F.3d 966, 974 (9th Cir. 2001). Under Rule 32 of the Arizona Rules of Criminal Procedure, a petitioner is precluded from postconviction relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

The Court concludes that if Petitioner were to return to state court now and attempt to litigate his forensic evidence misconduct allegations, the claim would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion.[10] *See* Ariz. R. Crim. P. 32.2(b);

---

[10] To the extent the Court concludes throughout this order that Petitioner does not have an available remedy in state court, because claims or portions of claims would be precluded as waived and untimely pursuant to Rules 32.2(a)(3) and 32.4(a), Petitioner does not assert that any exceptions to preclusion are applicable. *See Beaty v. Stewart*, 303 F.3d 975, 987 & n.5 (9th Cir. 2002) (finding no available state court remedies and noting that petitioner did not attempt to raise any exceptions to Rule 32.2(a)). First, Petitioner does not assert the application of any of the preclusion exceptions enumerated in Rule 32.2(b)(2), and the Court finds that none apply. *See* Ariz. R. Crim. P. 32.2(b)(2); 32.1(d)-(h). Second, Petitioner does not argue that any of the claims are of the type that cannot be waived absent a personal knowing, voluntary, and intelligent waiver. *See, e.g.*, *Cassett v. Stewart*, 406 F.3d 614, 622-23 (9th Cir. 2005).

The Court concludes, as to all of the claims in this order for which the Court determines there is no available remedy in state court, that none of those claims fall within the limited framework of claims requiring a knowing, voluntary, and intelligent waiver. *See* Ariz. R. Crim. P. 32.2(a)(3) cmt. (West 2004) (noting that most claims of trial error do not require a personal waiver); *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) (identifying the right to counsel, right to a jury trial, and right to a 12-person jury under the Arizona Constitution as the type of claims that require personal waiver); *see also State v.*

32.1(d)-(h). Therefore, this aspect of Claim A is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *See Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991) (observing that a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred").

A procedurally defaulted claim will not be considered on the merits absent a showing of cause and prejudice or a fundamental miscarriage of justice. *Id.* at 750. As set forth in Sections VIII and XI below, the Court rejects Petitioner's arguments that any procedural default should be excused. Accordingly, Petitioner's prosecutorial misconduct allegations relating to the forensic evidence are barred from merits review.

Even if not barred, the Court finds that Petitioner has failed to allege facts that, if true, would establish prosecutorial misconduct. Defense counsel at trial challenged the government's handling of the forensic evidence, and Petitioner's bald allegation of fabricated fingerprints rests solely on speculation and innuendo.

## C.    Confrontation, Abuse of Process & Other Misconduct

Petitioner alleges a plethora of additional instances of prosecutorial misconduct. These include limiting defense access to the fingerprint examiner, abusing the grand jury process, failing to investigate exculpatory leads, and making improper remarks in closing argument, including vouching for Godoy, commenting on Petitioner's right to remain silent, and inflaming the jury. (Doc. 94 at 95-108.)

Respondents assert, and Petitioner concedes, that his allegation concerning the fingerprint examiner was never raised in state court. (Doc. 139 at 37; Doc. 181 at 102-03.) Petitioner has no available state remedy to exhaust this claim now. Because, as discussed

---

*Espinosa*, 200 Ariz. 503, 505, 29 P.3d 278, 280 (App. 2001) (withdrawal of plea offer in violation of due process not a claim requiring personal waiver); *but cf. Cassett*, 406 F.3d at 622-23 (finding claim not defaulted because unclear whether personal waiver would be required under state law).

below, Petitioner has failed to establish cause and prejudice or a fundamental miscarriage of justice to excuse the default, this allegation is barred from merits review.

Respondents also assert that the grand jury allegation was found precluded by the state court in Petitioner's second PCR proceeding and is therefore defaulted. (Doc. 139 at 38.) The Court addresses this misconduct allegation as part of Claim B in Section II below.

Respondents do not allege lack of exhaustion or procedural default for Petitioner's remaining misconduct allegations. Nonetheless, this Court is not precluded from *sua sponte* reaching those issues. *See Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003). A review of the state record reveals that Petitioner never raised a claim challenging the prosecution's failure to investigate exculpatory leads. Because Petitioner has no available state remedies and is not excused from his procedural default on the grounds of cause and prejudice or a fundamental miscarriage of justice, this allegation is procedurally barred.

Petitioner's remaining allegations concerning Peasley's closing argument were raised in his first PCR petition. Specifically, he argued that Peasley improperly vouched for Godoy, commented on Petitioner's failure to testify or produce witnesses, inflamed the jury, and attacked defense counsel. (Doc. 143-2 at 62-71, Ex. J at 59-68.) In response to the PCR petition, the State argued that Petitioner had waived these issues by failing to object at trial and that they were precluded because the claims could and should have been raised on direct appeal. In its ruling, the PCR court noted that under Arizona's Rule 32.2(a)(3), a defendant is precluded from relief on any claim that has been waived at trial, on appeal, or in a previous collateral proceeding. (Doc. 144-3 at 174, Ex. Y at 23.) The court further noted, however, that under *Stewart v. Smith*, 202 Ariz. 446, 46 P.3d 1067 (2002), a claim of "sufficient constitutional magnitude" requires a knowing, voluntary, and intelligent waiver by the defendant, and the failure to raise such a claim may constitute ineffective assistance of counsel. (Doc. 144-3 at 174, Ex. Y at 23.) The court then concluded that none of the alleged misconduct, either individually or cumulatively, was of sufficient constitutional magnitude to require a knowing, voluntary, and intelligent waiver and were thus precluded. (*Id.* at 175-

76, Ex. Y at 24-25.) The court further found that counsel was not ineffective for failing to previously raise the allegations. (*Id.* at 176, Ex. Y at 25.)

"A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 130 S. Ct. 612, 614 (2009) (quoting *Coleman*, 501 U.S. at 729.) It is well established that Arizona's preclusion rule is independent of federal law, *see Stewart v. Smith*, 536 U.S. 856, 860 (2002), and the Ninth Circuit has repeatedly determined that Arizona regularly and consistently applies its procedural default rules such that they are an adequate bar to federal review of a claim. *See, e.g., Ortiz*, 149 F.3d at 932 (Rule 32.2(a)(3) regularly followed and adequate). Because Petitioner has failed to overcome his procedural default, this aspect of Claim A is procedurally barred. Moreover, as discussed below in Section IV, they lack merit.

### D.  Cumulative Effect

Petitioner asserts that even if his individual allegations of misconduct do not warrant relief, cumulatively such misconduct demonstrates that his due process rights were violated. However, because Petitioner has not established any specific instance of misconduct, there can be no cumulative prejudicial effect.

## II.  CLAIM B: *BRADY* VIOLATIONS

Petitioner asserts that the prosecution failed to disclose the following exculpatory material: (1) Det. Godoy's September 9 report, which contradicts his September 15 report; (2) Det. Nunez's report, which reflects Peasley's presence at the police station on November 20; (3) Det. Fuller's report, which details how Keith Woods came to the attention of authorities; (4) reports indicating police contacts with potentially exculpatory witnesses; (5) Det. Wright's handwritten notes detailing evidence collection; (6) undisclosed benefits to Keith Woods, including permitting him to continue dealing drugs and shielding him from prosecution for his alleged role in the Mariano's Pizza case; and (7) the grand jury transcript from the pizzeria case, which demonstrates alleged misconduct by Peasley. (Doc. 94 at 117-

26.)

## A.    **Procedural Defenses**

First, Respondents concede that Petitioner properly exhausted in his first PCR petition a claim based on the failure to disclose Godoy's September 9 report.  (Doc. 139 at 39.) Accordingly, this aspect of Claim B will be addressed on the merits.

Next, Respondents contend Petitioner never exhausted claims based on a failure to disclose the Fuller report, Wright notes, and reports relevant to alleged exculpatory witnesses.  (*Id.* at 39-40.)  The Court agrees.  Following denial of his first PCR petition, Petitioner filed a motion to reopen the proceedings, alleging that newly-discovered evidence demonstrated the prosecution had failed to disclose Wright's notes as well as other potentially exculpatory material from several witnesses.  (Doc. 144-3 at 189-94, Ex. Z at 4-9.)  However, the state court denied the motion, finding it procedurally improper and advising Petitioner to file a successive petition based on Rule 32's "newly-discovered evidence" or "actual innocence" exceptions if newly-discovered material facts existed.  (Doc. 193-1 at 2, Ex. 156 at 1.)  When Petitioner later filed his second PCR petition, the factual background section included references to Fuller's report, Wright's notes, and alternative lead information not investigated by police.  (Doc. 146-2 at 25-28, 33, Ex. MM at 3-6, 11.) However, Petitioner did not allege a claim based on the failure to disclose these materials, despite asserting *Brady* violations on several other grounds.  (*See id.* at 45-46.)  Because Petitioner now has no available state remedies and is not excused from his procedural default on the grounds of cause and prejudice or a fundamental miscarriage of justice, these aspects of Claim B are procedurally barred.

Finally, Respondents acknowledge that the allegations regarding the Nunez report, undisclosed benefits to Woods, and the grand jury proceeding were raised in Petitioner's second PCR petition but argue they are defaulted because the state court found them precluded.  (Doc. 139 at 40-42, 46-47.)  Petitioner counters that the state court's preclusion ruling was based on successiveness, not waiver; therefore, his allegations are not barred from

federal review. (Doc. 181 at 159.)

Petitioner raised a "failure to disclose" claim in his first PCR petition based on the Godoy report. Petitioner re-raised a "failure to disclose" claim in his second PCR petition based on newly-discovered evidence concerning the Nunez report, undisclosed benefits to Woods, and the pizzeria case's grand jury proceeding. The PCR court dismissed the claim as precluded by Rule 32.2 because Petitioner had raised a similar claim in the first PCR petition. (Doc. 146-2 at 132, Ex. PP at 7.) On petition for review to the Arizona Court of Appeals, Petitioner argued that the superior court's preclusion ruling was erroneous because the claim was based on newly-discovered evidence under Rule 32.1(e) and demonstrated actual innocence under Rule 32.1(h), both exceptions to preclusion. (Doc. 146-3 at 114, Ex. VV at 24.) The Court of Appeals disagreed, finding that "none of the claims at issue falls under the exceptions to the preclusion doctrine for claims already raised and ruled upon in prior postconviction proceedings. *See* Ariz. R. Crim. P. 32.2(b)." (Doc. 146-3 at 85, Ex. WW at 19.)

Invoking independent and adequate state grounds, the state court exercised its discretion and declined to address the merits of Petitioner's new allegations. Therefore, these aspects of Petitioner's "failure to disclose" claim are procedurally defaulted. Because as discussed below Petitioner has established neither cause and prejudice nor a fundamental miscarriage of justice, these allegations are procedurally barred. Moreover, as discussed next, they lack merit.

### B. Merits Analysis

Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government has a constitutional obligation to disclose information favorable to the defense. A successful *Brady* claim requires three findings: (1) the government willfully or inadvertently suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the issue of guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Evidence is

material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). This does not require a showing that the defendant would have been acquitted had the suppressed evidence been disclosed. *Id.* at 434-35. Instead, a *Brady* violation occurs if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome." *Id.* at 435. The duty to disclose includes impeachment as well as exculpatory material. *Bagley*, 473 U.S. at 676; *Giglio v. United States*, 405 U.S. 150, 154 (1972).

## 1. Godoy Report

In his September 15 report Godoy described receiving two phone calls on August 31 with information about possible suspects in the market murders—the first from an anonymous caller claiming a black man named "McKinney" and another person nicknamed "Cha-Chi" were involved, and the other from Sgt. Zimmerling, whose confidential informant identified Christopher McCrimmon and a Mexican male named Martin Soto or Cha-Chi. (Doc. 44, Ex. 26; Doc. 93-1 at 31-32, Ex. 26 at 1-2.) However, in an earlier report dated September 9, Godoy attributed Martin Soto's name to the anonymous caller, not to Sgt. Zimmerling's confidential informant, and said he learned from the Gang Unit that Martin Fong went by Cha-Chi. (Doc. 46, Ex. 54 at 1.)

During his first PCR proceeding, Petitioner alleged that the prosecution had failed to disclose Godoy's September 9 report, which was prepared for the Mariano's Pizza case file. (Doc. 139, Ex. Q.) In denying relief on this claim, the state court ruled:

> Based on the evidence produced at the August 28, 2002 Rule 32 evidentiary hearing the court finds the state did timely disclose the Marianos case report dated 9/9/92 (Exhibit E) to defense counsel. The court found both Mr. Stuehringer and Ms. Susan Grimes credible witnesses and finds that both were aware of and had seen the report prior to the Petitioner/defendant's trial.
>
> The court also finds that defense counsel intentionally and with good reason did not want Exhibit E produced to the jury. Defense counsel's reasoned strategy was to exclude both the September 9, 1992 report (Exhibit E) and the September 15, 2002 report (Exhibit N). Petitioner/defendant has

not shown why the decision not to use Exhibit E revealed ineptitude, inexperience, or lack of preparation. There may be a difference of opinion as to trial strategy but that does not lead to a conclusion of ineffective assistance of counsel. The trial strategy used in the Petitioner/defendant's trial was necessarily different than the strategies used in the trials of the Petitioner/defendant's co-defendants for one clear and compelling reason, the Petitioner/defendant's fingerprints were found at the crime scene in highly incriminating locations. There was no such physical evidence incriminating the co-defendants.

(Doc. 144-3 at 164-65, Ex. Y at 13-14.)

Petitioner argues that the state court's factual finding—that the report had been disclosed—is objectively unreasonable. He asserts that the state court failed to take into account that Stuehringer, and his long-time paralegal Susan Grimes, were operating under a conflict of interest from their work on Peasley's disciplinary case at the time of the Rule 32 evidentiary hearing. (Doc. 181 at 142.) He further contends that the state court's determination is unreasonable because Stuehringer's testimony regarding the report was equivocal and the court failed to consider other evidence suggesting non-disclosure. (*Id.* at 142-45.) Finally, Petitioner argues the finding is flawed because Stuehringer's defense strategy was to undermine Godoy's credibility and it is likely counsel would have emphasized the discrepancies between Godoy's September 9 and 15 reports had he known of them. (*Id.* at 144.)

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010); *see also Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

At the first Rule 32 hearing, Stuehringer testified that he assumed he was aware of the September 9 report because he and his paralegal reviewed a lot of materials from the

Mariano's Pizza case file. (Doc. 144-1 at 108-09, Ex. U (RT 8/27/01) at 107-08.) Billing records documented several trips by Susan Grimes to the prosecutor's office to review disclosure, and she recalled seeing the report even though it was not included in a list of Godoy reports she generated from a case database. (*Id.* at 135-36, Ex. U at 134-35; Doc. 144-2 at 134-36, Ex. V (RT 8/28/01) at 133-35.) In addition, Stuehringer explained that he interviewed members of the Gang Unit before trial because "Godoy, somewhere along the line, had said that he found out from someone in the Gang Unit that Martin Fong had the nickname of Chachi." (Doc. 144-1 at 81, Ex. U (RT 8/27/01) at 80.) It is the September 9 report that references this information from the Gang Unit, not the September 15 report. Based on this record, the Court cannot say that the state court's finding that the September 9 report had been disclosed was objectively unreasonable.

In any event, even if the September 9 report was not disclosed, Petitioner's claim fails because he cannot show that the report was material. He asserts that Godoy's September 9 and 15 reports demonstrate that Godoy was lying about his information concerning Cha-Chi's identity before the September 8 interview with Woods. (Doc. 94 at 117.) This lie, he contends, is itself "highly exculpatory" and would have put Stuehringer "in a far better position to attack Godoy." (*Id.* at 117-18.) However, the record demonstrates that Stuehringer was already aware that Godoy did not get Fong's name from Sgt. Zimmerling or the Gang Unit and thus at least one of Godoy's reports contained false information.

There is no dispute that Stuehringer had the September 15 report, in which Godoy described getting the name "Martin Soto" from Zimmerling. In preparation for trial, Stuehringer interviewed Zimmerling, as well as Detective Cuestas and Officer Cruze from the Gang Unit. Zimmerling told Stuehringer that the informant described the Mexican male only as Martin and Cha-Chi, without an identifying last name, and neither Cuestas nor Cruze were aware of Cha-Chi's identity. In an April 1993 pretrial interview with Godoy, Stuehringer challenged Godoy's assertion that he had gotten the name "Martin Soto" from Zimmerling, and Godoy conceded that Zimmerling had not been the source of Martin's last

name. (Doc. 144-1 at 95-96, Ex. U (RT 8/27/01) at 94-95.) Godoy further stated he got the name from the Gee family after asking them if there had been a former employee named Martin. (*Id.* at 96, Ex. U at 95.)

During a pretrial suppression hearing, Stuehringer again questioned Godoy about the source of Fong's name. Godoy testified that he believed Zimmerling had told him Cha-Chi was someone who "used to work at the store by the name of Soto, Martin Soto." (*Id.* at 139, Ex. U at 138.) Stuehringer then impeached Godoy with his earlier pretrial interview, in which he acknowledged Zimmerling had not been the source of Petitioner's name. (*Id.* at 140, Ex. U at 139.) He also cross-examined Godoy about the information the defense had obtained from Cuestas and Cruze, who denied knowing Cha-Chi's identity and thus could not have provided a link between Cha-Chi and Petitioner. (*Id.*)

It is apparent from this record that with or without the September 9 report, Stuehringer was well aware of the discrepancy in the September 15 report concerning Zimmerling and the source of Petitioner's name. Stuehringer testified in the Rule 32 hearing that he had interviewed Zimmerling, Cuestas, and Cruze to disprove Godoy's assertion that Cha-Chi was Martin Fong. (*Id.* at 77-85, Ex. U at 76-84.) He knew before trial that Godoy's September 15 report was not credible and contained the false claim that Zimmerling had identified Cha-Chi as Martin Soto. Nonetheless, Stuehringer chose to forgo presenting this evidence at trial. Given these facts, the Court concludes that the September 9 report would not have affected Stuehringer's chosen trial strategy, the reasonableness of which is discussed below in Section IV. Thus, the report was not material, and Petitioner's claim also fails on this ground.

## 2. Nunez Report

Petitioner claims that the prosecution failed to disclose a report from Det. Nunez, wherein Nunez indicates that Peasley was waiting with Godoy for the arresting officers to bring Keith Woods to the police station on November 20. (Doc. 94 at 119.) Although the report contains a disclosure stamp, Petitioner asserts that the report is "conspicuously absent" from a disclosure list generated from trial counsel's database. (Doc. 46, Exs. 58, 64.)

Because this allegation was not raised in his first PCR petition, during the state evidentiary hearing Petitioner did not question Stuehringer or his paralegal about the report, and there is nothing in the record regarding the breadth of counsel's database (i.e., whether every piece of disclosure was entered into the system). Even assuming the report was never disclosed, it does not provide evidence favorable to the defense and is not material.

The Nunez report documents police efforts to locate Keith Woods, who had gone into hiding apparently in an effort to avoid testifying against McCrimmon and Minnitt at an impending preliminary hearing. The fact that the prosecutor was at the police station and may have spoken with Woods provides neither exculpatory nor impeaching evidence. As discussed with respect to Claim A, Woods did not claim in his declaration that either before or during the November 20 recorded statement Peasley coerced or threatened him to add the additional identifying information about Cha-Chi or to clarify that neither McCrimmon nor Minnitt actually said Cha-Chi wore a mask. The entirety of the declaration with respect to Peasley reads: "When I met with Mr. Peasley at [the Tucson Police Department] he told me that portions of my story were mixed up or wrong and he would correct me." (Doc. 93-2 at 206, Ex. 98 at 2.) Woods does not state when this meeting took place, whether it was in preparation for the November 20 statement or Woods's testimony at the McCrimmon/Minnitt preliminary hearing and subsequent trial, or whether Peasley ever actually corrected any aspects of his "story." In short, there is simply no foundation for Petitioner's conjecture that the Nunez report "corroborates Woods' admission that Peasley and Godoy conspired together to fabricate his testimony." (Doc. 94 at 120.)

### 3. Benefits to Keith Woods & Grand Jury Transcript

Petitioner alleges the prosecution failed to disclose that Keith Woods was permitted to continue dealing drugs between his September 8 and November 20 statements and was shielded from prosecution in the Mariano's Pizza case. (Doc. 94 at 124-25.) He further contends the prosecution failed to disclose the entirety of a transcript from the grand jury's investigation into the pizzeria robbery and non-fatal shooting, which would have

substantiated the allegation that Peasley abused the grand jury process to protect Woods. (*Id.* at 125-26.)

The only support for the drug-selling allegation is a 2004 interview with Woods's girlfriend, who claims Godoy "probably" said Woods could continue selling drugs. (Doc. 47, Ex. 88, at 16.) In response to the question, "Did Keith ever tell you that Godoy had told him he could continue to sell drugs?", Price Woods responded "probably not in so many words but he didn't tell him to stop or I'll arrest you if you don't, or anything." (*Id.* at 17.) She further offered that Godoy knew Woods had sold drugs before and that he did not have a job. (*Id.*) These statements, even if true, do not establish that Godoy affirmatively told Woods he could continue selling drugs with impunity. Similarly, Petitioner only speculates concerning Peasley's motives during the Mariano's Pizza grand jury proceedings. Nonetheless, even assuming the prosecution was under an obligation to disclose these alleged benefits to Woods and that such disclosure did not occur, they do not constitute material impeachment in light of the information about Woods revealed at trial.

Petitioner insists that conviction in the Mariano case would have made Woods "useless to the state as a witness" and that the disclosure violation obscured the discovery of additional benefits Woods received "by turning state's evidence." (*Id.*) However, the Court reiterates that Woods did not testify on behalf of the prosecution. As discussed in depth below, Stuehringer called Woods as a defense witness as part of his strategy to undermine Godoy's credibility and offer the jury an alternate suspect. During his direct examination of Woods, Stuehringer brought out the following information concerning Woods's character: he previously was convicted of at least three felonies as well as giving false information to a police officer, served time in prison twice, was arrested for cocaine possession within a week of release from prison in August 1992, and was facing 25 years to life if convicted on the cocaine charge. (Doc. 147-2 at 5-13, Ex. DDD (RT 10/15/93) at 4-12.) Woods testified that he agreed to be an informant for an unrelated case, was released, and then rearrested on September 8 when he failed to contact police with the promised information. (*Id.* at 14-17,

Ex. DDD at 13-16.) Woods further testified that police threatened him with the cocaine charge and *told him he was a possible suspect in an armed robbery case.* (*Id.* at 20, Ex. DDD at 19.) It was at this point Woods offered police information about the El Grande murders, and Det. Godoy was called in. (*Id.* at 19, Ex. DDD at 18.)

At Petitioner's trial, the jury was aware that Woods was facing a possible life sentence for cocaine possession and was a suspect in an unrelated armed robbery case when he agreed to provide information concerning the market murders. Consequently, the Court finds there is no reasonable probability the result of the proceeding would have been different had the jury also learned that Det. Godoy chose not to pursue Woods for continuing to sell drugs and that prosecutors chose not to seek indictment against Woods for the armed robbery.

## III.   CLAIM C:  CONFLICT OF INTEREST

Petitioner argues that Stuehringer's subsequent representation of Peasley in state bar disciplinary matters violated Petitioner's "right to due process in state postconviction and federal habeas proceedings." (Doc. 94 at 134.) Respondents assert that Petitioner raised this claim in his first PCR petition as a violation of state ethical rules, not the federal constitution. (Doc. 139 at 48.) In denying relief, the PCR court found that Peasley's conduct in Petitioner's case was not part of a criminal indictment or the state bar's ethical complaint and thus there was no actual conflict or structural defect. (Doc. 144-3 at 179, Ex. Y at 28.)

Assuming without deciding that Petitioner properly exhausted a federal constitutional basis for this claim, he is not entitled to relief because the state court's determination did not constitute an objectively unreasonable application of controlling Supreme Court law. "Clearly established" federal law under § 2254(d)(1) consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams v. Taylor*, 529 U.S. 362, 365 (2000); *see Carey v. Musladin*, 549 U.S. 70, 76 (2006). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77.

The only Supreme Court cases cited by Petitioner in support of his argument that the PCR court unreasonably applied federal law are those based on the right to counsel under the Fifth and Sixth Amendments. (Doc. 94 at 143; Doc. 181 at 204.) However, Petitioner does not assert in these proceedings that his right to conflict-free counsel at trial or on appeal was violated. Rather, he argues that Stuehringer's subsequent representation of Peasley precluded Stuehringer from providing "the objective candor to which he was entitled to in his collateral appeals." (Doc. 94 at 139.) Petitioner does not cite, and the Court cannot find, any case from the United States Supreme Court holding that a state prisoner has a due process right to conflict-free witnesses in state or federal post-conviction proceedings. *Cf. Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998) (rejecting argument that *Evitts v. Lucey*, 469 U.S. 387 (1985), recognizing right to effective assistance of counsel on first appeal as of right, established a due process continuum across all phases of the judicial process); *Murray v. Giarratano*, 492 U.S. 1, 9-10 (1989) (finding no due process right to counsel for capital inmates in state postconviction proceedings).

Moreover, the Ninth Circuit has held that procedural errors arising during collateral-relief proceedings are not cognizable in habeas corpus proceedings under 28 U.S.C. § 2254 because they do not challenge a petitioner's detention. *Cooper v. Neven*, 641 F.3d 322, 331-32 (9th Cir. 2011); *Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam).

It may have been ill-advised for Stuehringer to represent Peasley in the disciplinary proceedings arising out of the prosecutor's clear misconduct in Petitioner's co-defendants' trials. However, the Court can discern no basis for federal habeas relief from Petitioner's conviction or sentences on this ground.

## IV. CLAIM E: INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL

Petitioner contends that Stuehringer failed to provide effective assistance at trial, in violation his rights under the Sixth and Fourteenth Amendments. Rather than separately enumerate each ground, Petitioner asserts that he has raised trial counsel's ineffectiveness as a "single claim." (Doc. 181 at 253.) Because a claim of ineffective assistance must rest upon

a specific factual basis, *see Moormann v. Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005) (noting that exhaustion of one ineffectiveness claim does not exhaust unrelated instances of ineffectiveness), the Court has discerned from the second amended petition the following specific allegations:

(1)  Counsel erred by calling Keith Woods as a witness;

(2)  Counsel failed to rebut Woods's testimony with (a) inconsistencies in Woods's November 20 statement, (b) Godoy's handwritten notes, (c) Godoy's false assertion the Gang Unit had identified Cha-Chi as Petitioner, (d) testimony from Bridget Lucero and Mona Lisa Munro indicating Petitioner was not Cha-Chi, and (e) disclosed and undisclosed benefits Woods received in exchange for his cooperation;

(3)  Counsel failed to recognize and object to Det. Godoy's perjury;

(4)  Counsel failed to utilize a criminal justice expert with whom he had consulted to critique the collection of forensic evidence;

(5)  Counsel failed to pursue an alibi defense;

(6)  Counsel ignored exculpatory leads;

(7)  Counsel failed to develop evidence providing an alternative explanation for Petitioner's fingerprint on the food stamp;

(8)  Counsel failed to call Petitioner as a witness;

(9)  Counsel failed to object to prosecutorial misconduct;

(10)  Counsel failed to obtain an identification expert;

(11)  Counsel failed to challenge Juror Simental;

(12)  Counsel failed to object to admission of irrelevant fingerprint evidence;

(13)  Counsel erred by stipulating to facts rather than presenting live testimony;

(14)  Counsel failed to impeach Queen Ray;

(15)  Counsel failed to make a record of the judge falling asleep during trial; and

(16)  Counsel failed to inform the Mexican Consulate about Petitioner.

(Doc. 94 at 170-203.)

**A.    Procedural Defenses**

Respondents concede that allegations 1, 3, 7, 8, 10, 11, and 16 were properly exhausted in state court and are appropriate for review on the merits. (Doc. 139 at 59-73.)  Respondents

further concede that allegations 2 and 9 were properly exhausted, but only in part. (*Id.*) Because the Court below determines that allegations 2 and 9 are meritless, it declines to reach the exhaustion issue. *See* 28 U.S.C. § 2254(b)(2); *Rhines,* 544 U.S. at 277.

Finally, Respondents assert that allegations 4, 5, 6, 12, 13, 14, and 15 were never raised in state court and are now procedurally barred. (*Id.*) With the exception of allegations 4 and 14, Petitioner makes no cogent counter-argument other than asserting that these allegations do not fundamentally alter his general "failure to adequately prepare and advocate" ineffectiveness claim. (Doc. 181 at 259.) Allegations 5, 6, 12, 13, and 15 set forth specific factual grounds for relief that were not fairly presented in state court. Because Petitioner has no available remedies and has not established cause and prejudice or a fundamental miscarriage of justice, these allegations are procedurally barred.

Petitioner raised allegations 4 and 14 in his second PCR petition.[11] (*See* Doc. 146-2 at 49, Ex. MM at 27.) However, the state court found these new ineffectiveness allegations precluded because the issue of counsel's effectiveness had already been raised and addressed in Petitioner's first PCR proceeding. (Doc. 146-2 at 132, Ex. PP at 7.)[12] On appeal, the Arizona Court of Appeals ruled that none of Petitioner's new ineffectiveness allegations qualified as exceptions to preclusion. (Doc. 146-3 at 85, Ex. WW at 19.) The state court's dismissal of allegations 4 and 14 rests on independent and adequate state grounds. Because Petitioner has failed to overcome this default, the allegations are procedurally barred.

**B.  Merits Analysis**

---

[11]  Petitioner notes that he appended an affidavit from a criminal justice expert to his first PCR petition. (Doc. 181 at 259.) However, Petitioner failed to reference the affidavit in his petition or affirmatively assert a claim based on counsel's failure to utilize this witness at trial.

[12]  *See also Stewart v. Smith*, 202 Ariz. at 450, 46 P.3d at 1071 ("[I]f a petitioner asserts ineffective assistance of counsel at sentencing, and, in a later petition, asserts ineffective assistance of counsel at trial, preclusion is required without examining facts. The ground of ineffective assistance of counsel cannot be raised repeatedly. There is a strong policy against piecemeal litigation.").

To establish an ineffectiveness claim, a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The inquiry is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

To satisfy *Strickland*'s first prong, deficient performance, a defendant must overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* For example, while trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted); *Rompilla v. Beard*, 545 U.S. 374, 381 (2005).

Because an ineffective assistance claim must satisfy both prongs of *Strickland*, the reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697 ("if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed"). A petitioner must affirmatively prove prejudice. *Id.* at 693. To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The calculus involved in assessing

prejudice "should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695.

Under the AEDPA, this Court's review of the state court's decision is subject to another level of deference. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*, 129 S. Ct. 1411, 1413 (2009) (explaining that habeas review of IAC claims is "doubly deferential"). Petitioner must make the additional showing that the state court's ruling that counsel was not ineffective constituted an unreasonable application of *Strickland*. 28 U.S.C. § 2254(d)(1).

## 1. Calling Keith Woods as a Witness

Because Keith Woods was precluded by *Bruton v. United States*, 391 U.S. 123 (1968), from testifying for the prosecution about his conversation with McCrimmon and Minnitt, Petitioner asserts that Stuehringer's decision to call him as a witness was "reckless and devastating." (Doc. 94 at 171.) He further argues that counsel should have reconsidered this decision after the trial court denied his pretrial motion to preclude any testimony concerning Woods's more incriminating November 20 statement to police. (*Id.* at 172.) According to Petitioner, but for counsel's decision to call Woods, the jury would not have heard

> highly prejudicial details from Woods' otherwise inadmissible September 8 statement, such as "[t]he Mexican set it all up . . . [h]e went in by himself [h]e shot him, and uh, and shot the other guy." Woods testified on direct that the "Mexican" was called "Cha-Chi," and although he didn't know him at the time of his first interview with Godoy, he eventually met "Cha-Chi." Stuehringer showed Woods a photograph of Martin Garza—the real Cha-Chi—and Woods, in front of the jury, denied recognizing him, or ever having seen him.
>
> In an effort to "draw the sting" of the November 20 statement that was certainly coming out during cross, Stuehringer himself elicited the most damning testimony of all: 1) "Martin/Cha-Chi" was Betty Christopher's boyfriend, 2) Woods was introduced to "Martin/Cha-Chi" at Bridget Lucero's, 3) Woods recognized Martin Fong as the person he met at Lucero's, and 4) McCrimmon and Minnitt said "Fong plan[ned]" El Grande.

(Doc. 94 at 173 (citations omitted).)

At the first PCR evidentiary hearing, Stuehringer explained why he called Woods as a witness:

My memory of the case was that, certainly, the bad part of the case from Mr. Fong's standpoint were the fingerprints. It was my objective to do everything I could in the case to mask or draw the jury's attention away from fingerprints. So, in that regard I went after Godoy.

I made a strategic decision to call Keith Woods which, at least in part, helped me go after Godoy. When I say "go after," I attacked his credibility, is what I mean, Judge. Similarly, I attacked the credibility of Queenie Ray, who was another State witness.

Um, certainly part of the trial strategy was, through the testimony of Keith Woods, was to present to the jury that when McCrimmon and Minnitt talked with Keith Woods, and when Keith Woods talked to Godoy the first time on September 8, 1992, that the only information the police department had was McCrimmon, Minnitt, and someone named Chachi.

And so, our theory at the time of trial was it was McCrimmon, Minnitt, and Chachi. We attempted as well as we could to prove that Martin Fong was not Chachi. I don't think there was any evidence in front of the jury that Martin Fong was Chachi.

. . . .

Somewhere in the course of my cross of Godoy, I think I established or tried to establish that the first time he knew anything about someone named Chachi was when he talked to Keith Woods on September 8, 1992.

. . . .

Again, my objective with Keith Woods is, he gave a statement on September 8th, 1992, which I thought was very helpful to my strategy. Keith Woods later on in his testimony moved around and changed things, materially so. But I wanted the jury to believe that September 8th, 1992, statement in toto, in its entirety. Because Keith Woods said in that statement the third person was Chachi. He said in that statement the third person had a mask on, which would negate the State's contention that whoever gained access was somehow a familiar face, couldn't be familiar if he had a mask on. So I wanted the jury to believe that September 8th, 1992, statement in toto.

(Doc. 144-1 at 144-45, 148, 157, Ex. U (RT 8/27/01) at 143-44, 147, 156.)

Stuehringer further testified that he talked over the decision to call Woods with his colleagues as well as with Petitioner. (*Id.* at 166, 169, Ex. U at 165, 168.) Additionally, although the trial court had denied his motion to preclude the November 20 statement, Stuehringer used that testimony to argue that Woods had changed his testimony at the prompting of Godoy. (*Id.*) This, Stuehringer explained, "allowed me to further impeach Godoy and try to dirty him up in a fashion, once again, to obfuscate, cloud, mask the importance of the forensic evidence. That's why I called Keith Woods. It was a gamble. I

- 42 -

gave it a lot of thought."  (*Id.*)

At the second PCR evidentiary hearing, Stuehringer repeated his explanation for calling Woods and further emphasized that his goal was not only to attack Godoy's credibility but to show that someone else had committed the crime:

> The State had a key witness named Keith Woods, who had given statements that he was a friend of McCrimmon and Minnitt, and that the two of them had in effect confessed to him their involvement in the case.  And in that confession they said the third person was a guy named ChaChi, who went into the store that night with a mask on his face.
>
> And so one of the things I wanted to accomplish in the case was to demonstrate that Martin Fong was not ChaChi.  I knew he was not ChaChi.  I think we demonstrated beyond any question that he was not ChaChi, never been known as ChaChi or named ChaChi.  ChaChi was someone named Martin Garza, who came into the trial in front of the jury, presented in a very seedy fashion.  Martin Garza admitted knowing McCrimmon, at the time was a friend of McCrimmon, admitted that he and McCrimmon had actually done illegal dealings in the past.  And so an integral part of the trial strategy was to demonstrate that someone named ChaChi committed this homicide with McCrimmon and Minnitt, and Martin Fong was not him.

(Doc. 144-3 at 46-47, Ex. W (RT 8/28/02) at 45-46.)  Stuehringer further testified that he believed he had mounted a "vigorous defense" and thought there was a chance of winning the case, despite the strong fingerprint evidence.  (*Id.* at 48, Ex. W at 47.)

In denying relief on this ineffectiveness allegation, the PCR court ruled:

> Defense counsel's reasoned trial strategy was to use Keith Woods' original statement of September 9, 1992 to implicate the person referred to as "Cha-Chi" and direct the jury's attention to this person and away from the defendant and particularly away from the fingerprint evidence implicating the defendant. This was a particularly plausible theory as the Petitioner/defendant's attorney not only provided evidence of a plausible identity for this third person in Martin Garza who has the nickname ChaChi and was a friend of one of the co-defendants and lived in a referenced neighborhood.  This was a critical part of the defense strategy.  The "Cha-Chi" described by Keith Woods wore a mask.  The state claimed the defendant was able to gain after-hours access to the market because he was known by Mr. Gee.  The two points are not reconcilable.  If the perpetrator needed to reveal himself to gain access he would not wear a mask. The use of a mask implies "Cha-Chi" was not Martin Soto-Fong, from which the jury may infer Martin Soto-Fong was not a participant in the crimes.  Keith Woods was critical to the defense's theory of the case.  This was a calculated and reasoned trial strategy by an experienced criminal defense attorney.

(Doc. 144-3 at 165-66, Ex. Y at 14-15.)

Petitioner argues that the PCR court's denial of this claim was based on both an

unreasonable application of *Strickland* and an unreasonable determination of the facts. (Doc. 181 at 273-74.) He asserts that the state court's factual finding—that Stuehringer's decision to call Woods was strategic—was objectively unreasonable for three reasons: (1) counsel could have elicited from Godoy the identification of Cha-Chi as a participant in the murders, (2) the PCR court failed to consider the trial court's ruling that Woods's testimony would not be limited to his September 8 statement, and (3) Stuehringer's explanation of his strategy during the PCR hearings was suspect given his "conflicted loyalties." (*Id.* at 276-77.) The Court disagrees.

First, Petitioner does not explain how the identification of Cha-Chi would have been admitted through Godoy without opening the door to the rest of Woods's statements through Godoy's testimony. In other words, if the defense did not call Woods and instead chose to waive Petitioner's confrontation rights for Godoy to describe Woods's statement about McCrimmon's and Minnitt's identification of Cha-Chi, there is little doubt the trial judge would have permitted the prosecution to elicit the rest of Woods's September 8 and November 20 statements from Godoy. If Petitioner's argument is premised on Godoy testifying to the "Cha-Chi" identification he received from either the anonymous August 31 caller or the Gang Unit's confidential informant, it is highly likely the prosecution would have successfully precluded such testimony on hearsay grounds. The PCR court's finding that calling Woods was a strategic way to cast Cha-Chi (and consequently Martin Garza) as the third assailant was not objectively unreasonable.

Second, although Stuehringer had originally hoped to limit Woods's testimony to the September 8 statement, he testified at the PCR hearing that the discrepancies from the November 20 statement bolstered his impeachment of Godoy by suggesting Godoy had coached Woods to change his statement. Indeed, counsel argued this very point to the jury. (Doc. 189-1 at 108, Ex. 150 (RT 10/26/93) at 107.) Thus, although the PCR court did not expressly discuss this fact, its failure to do so does not render objectively unreasonable its finding that Stuehringer made a strategic decision to call Woods.

Third, the court declines Petitioner's invitation to assume Stuehringer's representation of Peasley in the state bar disciplinary proceedings necessarily renders his PCR hearing testimony suspect. Stuehringer was under oath and there is no evidence to suggest he lied about his rationale for calling Woods as a witness. It was not objectively unreasonable for the state court to find Stuehringer to be a credible witness.

In sum, the state court's finding that calling Woods was a reasoned strategic decision was not objectively unreasonable. As Stuehringer explained, the fingerprint evidence was highly inculpatory. Although counsel sought to undermine that part of the case by bringing out numerous problems with the collection, documentation, and storage of the forensic evidence, it was also strategically reasonable to advance the theory of an alternate suspect. *See Soto-Fong*, 187 Ariz. at 194, 928 P.2d at 618 ("Fingerprint evidence and other testimony connected defendant to the crime. It is understandable that defense counsel would want to raise the issue of whether Cha-Chi, a person other than Fong, committed the murders, even at the expense of other evidence indicating that 'Cha-Chi' was Fong."). In addition, utilizing Woods had the secondary benefit of allowing counsel to challenge Godoy's credibility vis-a-vis Woods' changed statements. Without question, the decision to call Woods was a risky one. However, it was made after counsel conducted a thorough investigation and considered the consequences. Thus, it was a strategic decision that is "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

### 2.     Rebutting Woods's Testimony

Petitioner alleges that after deciding to call Woods as a witness, counsel was ineffective for failing to rebut Woods's testimony with (a) inconsistencies in Woods's November 20 statement suggesting Godoy told Woods that Petitioner was Cha-Chi, (b) Godoy's handwritten note "Fong shot two" from the September 8 interview with Woods even though Woods had not identified Fong by name, (c) Godoy's questionable source of information that Cha-Chi was Petitioner, (d) testimony from Bridget Lucero that Woods had never met Fong at her home, as Woods claimed in his November 20 statement, and testimony

from Lucero and Mona Lisa Munro indicating there was little connection between Petitioner and his co-defendants, and (e) disclosed and undisclosed benefits Woods received in exchange for his cooperation. (Doc. 94 at 175-80.)

November 20 Statement

After Woods fled in an attempt to avoid testifying, he was apprehended on November 20, 1992, and made a second recorded statement to Det. Godoy. Godoy insisted that Woods relay "exactly" what McCrimmon and Minnitt had said:

Q.      Okay, who went to the El Grande?

A.      Him . . Chris, Andre and uh Fong. I never well I never met him though I never . .

Q.      Okay, did they use the name Fong or did they use another name?

A.      Yeah they used another name, they used another name but it they were talking about the Mexican dude I can't I don't remember what name they used though.

Q.      Were they using a nickname or his name?

A.      Mmm I'm not even for sure but I didn't know him you know.

Q.      Okay . . but when I talked to you last you know a couple months ago you . .

A.      Um hum.

Q.      . . you said something about a guy named Chachi (ph) . .

A.      Yeah yeah there you go yeah yeah but see that's what I already that wasn't that wasn't . . uh . . Fong though, but that's what I heard the Chachi name.

Q.      Okay . . just just just tell me what you heard on that day okay, did they did they mention Chachi or did they mention another name?

A.      . . Uh yeah they were mentioning they mentioned they mentioned that name. Okay, they mentioned what name . . Uhh . .

Q.      . . Chachi?

A.      . . Chachi, yeah.

(Doc. 45, Ex. 44 at 8-9.) Subsequently, after further questioning, Woods explained that he did not know Chachi until after meeting him at the home of McCrimmon's girlfriend, Bridget

Lucero, after McCrimmon and Minnitt had been arrested. (*Id.* at 23.) He further said he recognized Petitioner as the person he met at Lucero's home after seeing him on television following Petitioner's arrest:

> Q.   Okay and and that's the same guy you met at Bridget's house.
>
> A.   Um hum . . Martin that's that's that's the name that they were using.
>
> Q.   They were using Martin?
>
> A.   They were using Martin.
>
> Q.   So they weren't using Chachi?
>
> A.   Uh they but see Chris had mentioned he had mentioned Chachi he said he had said Chachi different on different occasions but see at the time I'm thinking it's two different people that right you know and then it might be still might be this you know but I'm thinking it's two different people because uh he he was saying like but Martin that's that's the name they were using . . most well Chris was using it most of the time.
>
> Q.   Okay so they were telling you about this conversation uh about when they're giving you details about the night of the homicide they were mentioning a guy name Chachi and Martin . .
>
> A.   Yeah.
>
> Q.   . . and uh and you don't know if those were the same two guys or or different or different guys.
>
> A.   I I don't know yeah.

(*Id.* at 34.)

Petitioner argues that counsel should have emphasized that early in the November 20 interview Godoy was the first to use Petitioner's name when referring to Cha-Chi, which would have demonstrated that Godoy manipulated information to link the name Cha-Chi to Petitioner. (Doc. 94 at 175-77.) Petitioner did not present this allegation in his PCR petition. Regardless, the Court finds that any deficiency from not emphasizing the specific references cited by Petitioner was not prejudicial because during trial Stuehringer made the same point urged here—that Godoy had repeatedly identified Petitioner by name during subsequent interviews with Woods. For example, Woods testified that he discussed "Martin Fong" with Detective Godoy after he was apprehended; that in an another interview on November 23 he

told Godoy that McCrimmon, Minnitt, and "Fong" had planned the robbery; and that Godoy referred to "Fong" during the interview. (Doc. 147-2 at 51-54, Ex. DDD (RT 10/15/93) at 50-53.)

Petitioner also argues that counsel should have called Bridget Lucero as a witness to refute Woods's claim during his November 20 statement that he had once met Petitioner at Lucero's home. (Doc. 94 at 179.) He further asserts that Lucero and Minnitt's girlfriend, Mona Lisa Munro, would have testified that "there was little to no connection" between Petitioner and his co-defendants. (*Id.* at 180.) Petitioner raised these allegations in his PCR petition. In denying relief, the state court noted that Petitioner had failed to call either individual as a witness at the PCR evidentiary hearing. Without their testimony, the court determined that Petitioner had failed to meet his burden of establishing either deficient performance or prejudice. (Doc. 144-3 at 170, Ex. Y at 19.) Petitioner argues that the state court's ruling was objectively unreasonable because he had appended transcripts of their grand jury testimony to his PCR petition. Regardless, Petitioner is not entitled to relief because the failure to call Lucero and Munro was not prejudicial.

Lucero testified before the grand jury that she paid no attention to McCrimmon's friends and met Petitioner only once in passing on the street a few months before the murders. (Doc. 93-2 at 102-03, Ex. 73 at 87-88.) Munro testified that the "only people I know is Chris, Andre, and I met a Keith, and that's it" and denied ever meeting a person named Cha-Chi, Martin, Martin Soto, or Martin Fong. (*Id.* at 64, Ex. 73 at 49.) While counsel could have called Lucero to refute Woods's claim he had met Petitioner at her apartment after the homicides, the impeachment value of this evidence was minimal compared to the overarching suggestion by the defense that Godoy had encouraged Woods to embellish his identification of Cha-Chi. Specifically, Woods conceded on examination by Stuehringer that he had never mentioned in his initial statement meeting Cha-Chi or knowing that Cha-Chi was "Martin" and Betty Christopher's boyfriend. (Doc. 147-2 at 46-49, Ex. DDD (RT 10/15/93) at 45-48.) In addition, given Lucero's assertion that she met Petitioner only once and did not pay

attention to McCrimmon's friends, there is no reasonable probability of a different result had Lucero testified she never heard McCrimmon call Petitioner Cha-Chi. Likewise, Munro denied knowing Petitioner, so her testimony would have been of little value on the issue of whether Petitioner was known as Cha-Chi.

### Godoy Notes & Reports

Petitioner alleges that counsel was ineffective for not utilizing a note Godoy wrote during the September 8 Woods interview containing the phrase "Fong shot two." (Doc. 94 at 177.) He further contends that counsel should have called detectives from the Gang Unit to demonstrate that none had identified Petitioner as Cha-Chi, as Godoy wrote in his September 9 report. (*Id.*) Petitioner raised the latter allegation in his PCR petition. In denying relief, the state court determined that counsel had made a strategic and deliberate decision to keep the jury from knowing that Godoy had gotten Petitioner's name prior to meeting with Woods on September 8. (Doc. 144-3 at 170, Ex. Y at 19; *see also id.* at 158-64, Ex. Y at 7-13.)

Petitioner argues that the state court's finding of deliberate strategy was objectively unreasonable because (1) the September 9 report had never been disclosed to defense counsel, and (2) counsel should have abandoned the Cha-Chi misidentification defense after the court denied his motion to exclude the November 20 statement. (Doc. 181 at 278.) The Court has already addressed these points, finding that Stuehringer was clearly aware of the "Cha-Chi" discrepancies in Godoy's reports and that it was reasonable to proceed with the Cha-Chi defense because Woods's embellished November 20 statement helped to discredit Godoy.

The state court's finding of deliberate strategy to exclude information Godoy obtained prior to interviewing Woods on September 8 is supported by the record and was not objectively unreasonable. Stuehringer testified that he wanted the jury to believe Godoy had gotten the name Cha-Chi from Woods on September 8 because in the September 8 statement Woods claimed he had never met Cha-Chi, did not know Cha-Chi, and that Cha-Chi had worn a mask. Stuehringer further testified that his goal was to demonstrate that the September 8

statement was the truth and that the later November 20 statement had been influenced by
Godoy's zealous attempt to link Cha-Chi to Petitioner. Use of either Godoy's handwritten
note or witnesses from the Gang Unit would have revealed that Godoy already had
Petitioner's name and believed he was Cha-Chi, the suspected third robber, prior to meeting
with Woods the first time. This in turn would have undermined the defense's theory that
Woods's September 8 statement was reliable (i.e., not influenced by Godoy) and that Martin
Garza, not Petitioner, was the Cha-Chi described by Woods in this statement.

<u>Benefits to Woods</u>

In his first PCR petition, Petitioner argued that counsel was ineffective for failing to
thoroughly cross-examine Woods about the monetary payments he received from the State.
He did not assert, as he does here, that counsel was also ineffective for failing to elicit
testimony concerning Woods's continued drug dealing and not being prosecuted for the
Mariano's Pizza shooting and robbery.

In denying relief on the initial allegation, the state court ruled:

> Mr. Woods received two forms of compensation from the state for his
> testimony, 1) between $500 and $700 to relocate, and 2) nonprosecution on a
> drug charge that could have resulted in a twenty-five year sentence.
> Petitioner/defendant's trial counsel focused on the latter form of compensation.
> It is not clear why the Petitioner/defendant believes a jury would believe Mr.
> Woods' testimony knowing the state agreed not to prosecute him on a charge
> that could have resulted in twenty-five years in prison but that same jury would
> have rejected Mr. Woods' testimony had they known he received $700 in
> addition to the nonprosecution. The additional benefit of $700 is of little
> consequence considering the magnitude of the nonprosecution for a twenty-five
> year prison sentence. The lack of such testimony does not undermine
> confidence in the verdict.

(Doc. 144-3 at 171, Ex. Y at 20.) Petitioner does not assert that this determination is based
on either an unreasonable finding of fact or application of law. This Court concludes that the
state court's ruling is supported by the record and is not objectively unreasonable.

With regard to the continued drug dealing and lack of prosecution in the Mariano's
Pizza case, the Court determined as part of Petitioner's *Brady* claim that neither constituted
material impeachment evidence. Thus, even assuming this information was properly
disclosed and available to defense counsel, Stuehringer's failure to impeach Woods with these

additional benefits was not prejudicial. *See supra* Section II.B.3.

### 3. Objecting to Godoy's Perjury

Because the state court found that Det. Godoy's testimony was not perjured and did not, when taken as a whole, leave the jury with a false impression, the court concluded that Stuehringer was not ineffective for failing to object to such testimony. (Doc. 144-3 at 169, Ex. Y at 18.) This Court has similarly concluded that Godoy did not commit perjury or mislead the jury. *See supra* Section I.A.2. Accordingly, the Court finds that the state court's denial of this claim was not based on either an unreasonable application of *Strickland* or an unreasonable determination of the facts.

Petitioner also asserts that Stuehringer should have impeached Godoy with his conflicting September 9 and 15 reports. (Doc. 94 at 184.) However, as just addressed, the PCR court's finding of deliberate strategy to exclude information Godoy obtained prior to interviewing Woods on September 8 is supported by the record and was not objectively unreasonable. (Doc. 144-3 at 170, Ex. Y at 19; *see also id.* at 158-64, Ex. Y at 7-13.)

### 4. Explanatory Fingerprint Evidence

Petitioner alleges that counsel was ineffective for failing to present evidence from himself or his father that Petitioner recalled buying beer with food stamps on Father's Day, three days before the murders. He asserts that counsel also should have presented testimony from a former El Grande employee, who could have testified that the market regularly kept unstamped single food stamps in the cash register, and from a "retail practices expert," who could have testified to the common practice of retaining single food stamps in a register for the purpose of making change.

In denying these allegations, the PCR court found that the proposed testimony from Petitioner and his father would have added nothing to that of Betty Christopher, who testified at trial that she and Petitioner regularly shopped at the market using food stamps. (Doc. 144-3 at 168, Ex. Y at 17.) With regard to counsel's failure to elicit testimony concerning the handling of food stamps at the market, the court reviewed the testimony of Ezekiel Martinez

and Petitioner at the hearing before the prior PCR judge and determined that neither was "convincing regarding the issue whether food stamps were or were not stamped as part of the closing procedures." (*Id.* at 167, Ex. Y at 16.) According to the court, Martinez (a cousin of Petitioner) was "not credible" and Petitioner was "not really knowledgeable regarding those procedures." (*Id.*) Finally, the court noted that Petitioner had failed to produce any evidence from a "retail practices expert" to support his claim. (*Id.* at 166, Ex. Y at 15.)

Petitioner argues that the state court made several unreasonable determinations of fact, including failing to explain its credibility determination of Ezekiel Martinez and ignoring the expert affidavit appended to his PCR petition concerning the practice of retaining food stamps in a cash drawer. (Doc. 181 at 280-81.) Even if true, Petitioner is not entitled to relief because counsel's failure to present this evidence did not result in prejudice.

Petitioner told police when he was first arrested that he was last in the market about two weeks before the homicides to buy beer. (Doc. 93-1 at 38, Ex. 26 at 9.) Any testimony from Petitioner or his father that Petitioner had bought beer only three days before the offense would have been impeached with this statement. More critically, Petitioner's fingerprints were also found on two plastic bags on the counter near the victim. Thus, the fact that the market may have routinely kept single food stamps for change or that Petitioner may have been permitted to purchase beer with food stamps sometime prior to the murders had little exculpatory value.

### 5.      Calling Petitioner as a Witness

Petitioner argued in his first PCR petition that counsel was ineffective for not calling him as a witness. At the evidentiary hearing before Judge Alley, Petitioner testified that he asked Stuehringer several times about testifying but that counsel refused to call him. (Doc. 195-1 at 87-88, Ex. 170 (RT 1/31/01) at 30-31.) He further testified that he did not inform the trial judge nor make a record of his desire to testify. (*Id.* at 89, Ex. 170 at 32.) Stuehringer testified that he discussed the issue with Petitioner, and "[i]t was agreed he would not testify." (Doc. 144-1 at 172, Ex. U (RT 8/27/01) at 171.) The state court determined that

counsel made a strategic decision not to call Petitioner. (Doc. 144-3 at 168, Ex. Y at 17.)

In arguing that the state court unreasonably found that Petitioner agreed not to testify, Petitioner asserts that the court "overlooked all evidence to the contrary." (Doc. 181 at 281.) The only evidence Petitioner cites is his own testimony at the PCR hearing that he told counsel he wanted to testify. However, Petitioner also conceded that he failed to make a record of his request. *See United States v. Joelson,* 7 F.3d 174, 177 (9th Cir. 1993) ("[W]aiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so."). The state court's determination was not objectively unreasonable. Moreover, in light of the fingerprints found on the plastic bags and Petitioner's statement to police that he was last in the market two weeks before the murders, there is no reasonable probability of a different outcome had Petitioner testified that the market routinely kept unstamped food stamps in the cash drawer or that he purchased beer several days before the homicides using food stamps.[13]

### 6. Objecting to Prosecutorial Misconduct

Petitioner asserts that counsel failed to object to improper closing argument and prosecutorial vouching. In finding that Petitioner's prosecutorial misconduct claims were precluded because they could have been raised prior to the first PCR petition, the state court summarily denied on the merits Petitioner's companion claim that counsel had been ineffective for failing to object to numerous aspects of Peasley's closing argument, including vouching for Godoy. (Doc. 144-3 at 173-76, Ex. Y at 22-25.) Because the state court did not explain its ruling, this Court may grant relief only if there was "no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

After considering the record, the Court concludes that the PCR court was not objectively unreasonable in rejecting Petitioner's claim of ineffective assistance for failing

---

[13]     The Court also questions whether the jury would have accepted Petitioner's bald assertion that Fred Gee would have permitted Petitioner, a minor, to buy alcohol with food stamps.

to object to prosecutorial misconduct. The state court reasonably could have determined that the failure to object was either not deficient or not prejudicial.

Petitioner first argues that counsel was ineffective for failing to object to Peasley's assertion during oral argument that the "first time that Godoy is able to sit down and talk with anybody who gives him direct information about what happened is that contact on September 8th with Keith Woods." (Doc. 94 at 183.) Petitioner claims this was a lie and exacerbated Godoy's alleged perjury. (*Id.*) However, nothing in Peasley's statement is false. Godoy received an anonymous phone call prior to September 8 identifying possible suspects; however, he did not "sit down and talk with anybody who gives him direct information" prior to his first meeting with Woods. Furthermore, it was not unreasonable for counsel not to object in light of the defense strategy to keep from the jury knowledge Godoy obtained prior to September 8 and to leave jurors with the impression that Godoy had obtained the name "Cha-Chi" from Woods. (*See* Doc. 144-3 at 158-64, Ex. Y at 7-13.)

Petitioner next asserts that Peasley improperly argued Woods's "false" testimony (Doc. 94 at 198), but as discussed above, Petitioner has failed to establish that the prosecution knowingly elicited false testimony from Woods. Petitioner also asserts that Peasley improperly discredited the defense theory that Godoy had manipulated evidence and that acquittal would not be the proper remedy for any alleged misconduct by Godoy. (*Id.* at 199, 201.) However, it is well established under Arizona law that counsel have "wide latitude in their closing arguments to the jury," *State v. Comer*, 165 Ariz. 413, 426, 799 P.2d 333, 346 (1990)," and the state court may reasonably have found that such latitude permitted counsel's argument that failure to convict would amount to a miscarriage of justice. The Court further disagrees with Petitioner's claim that Peasley shifted the burden to the defense when he told the jurors they had to be "satisfied that there is a reasonable doubt about the defendant's guilt" if they were going to acquit. (Doc. 94 at 200.) Peasley commented only on what the jury had to find, not what the defendant had to prove. This Court concludes that the state court could have reasonably determined that the failure to object to these allegedly improper comments

was neither deficient nor prejudicial.

Finally, Petitioner contends Peasley improperly vouched for Godoy. (*Id.* at 199-200.) During rebuttal closing argument, Peasley told the jury that Godoy was

> an honest man and a person who has been doing this a long time, and basically one of the best detectives in his position, one of the best in investigating homicide detectives.

> The fact of the matter is distinguish between making a mistake and being dishonest. And what Mr. Stuehringer wants you to do is, because there were mistakes made, he wants you to automatically conclude that Godoy is a liar.

(Doc. 189-1 at 143, Ex. 150 (RT 10/26/93) at 142.) Petitioner asserts that this improperly conveyed a personal opinion about Godoy's reputation from outside the record and placed the prestige of the government behind the witness. (Doc. 94 at 200.) He further argues that he was prejudiced by counsel's failure to object because the defense theory at trial relied upon impeaching Godoy. *Id.*

Peasley's references to Godoy as an "honest man" and "one of the best in investigating homicide detectives" are not based on evidence presented at trial. However, he did not actually opine that Godoy had testified "truthfully." *Cf. State v. Vincent*, 159 Ariz. 418, 423, 768 P.2d 150, 156 (1989) (holding that prosecutor improperly placed his personal opinion and prestige of county attorney behind witness by arguing that "the State wouldn't have put [the witness] on the witness stand if they didn't believe every word out of his mouth about the conversations he had."). Even assuming these statements amounted to improper vouching, this Court concludes that the state court could have reasonably determined that the failure to object was not prejudicial. The jury was aware that Godoy had previously testified untruthfully in related hearings. The defense brought out on cross-examination that Godoy (1) had sworn under oath as part of a warrant application that Petitioner's fingerprint was lifted from a food stamp found in the cash register, not next to the victim's body; and (2) had testified under oath at Petitioner's juvenile transfer hearing that Petitioner confessed to Woods and that Woods saw Petitioner with the murder weapon. (Doc. 148-1 at 39, 72-73, Ex. FFF (RT 10/20/93) at 38, 71-72.) In addition, the trial court instructed the jury that what the

lawyers say in closing arguments is not evidence. (Doc. 189-1 at 192, Ex. 150 (RT 10/26/93) at 191.) Finally, although the defense sought to undermine Godoy's credibility, especially with regard to his interactions with Woods and Ray, the prosecution had a strong case against Petitioner in light of the highly inculpatory fingerprint evidence, which was collected, lifted, and compared by technicians, not Godoy. Thus, the state court could have reasonably found no prejudice from counsel's failure to object.

### 7.    Obtaining an Identification Expert

Petitioner asserts ineffectiveness from counsel's failure to obtain an identification expert to challenge the reliability of the identifications made by Woods and Ray, who identified Petitioner after seeing him on television following his arrest.[14] (Doc. 94 at 202.) In denying relief, the PCR court observed that Petitioner failed to tender any evidence showing that the identifications were inherently unreliable or to proffer an expert opinion, and declined to "speculate as to what the testimony of an identification expert might be." (Doc. 144-3 at 127-28, Ex. X at 8-9.)

Petitioner argues only that the identifications "were obviously unreliable" and thus the state court's ruling was objectively unreasonable. (Doc. 181 at 284.) This is wholly insufficient to satisfy Petitioner's burden under § 2254(d). *See Grisby v. Blodgett,* 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about what an expert could have said is not enough to establish prejudice."); *Osumi v. Giurbino,* 312 Fed.Appx. 23, 24 (9th Cir. 2008) (denying claim that trial counsel was ineffective for not presenting expert testimony about the unreliability of eyewitness testimony where petitioner failed to show a reasonable probability that such testimony would have changed the trial outcome).

### 8.    Challenging Juror Simental

Petitioner asserts that counsel should have challenged for cause or removed with a peremptory strike Juror Simental, "who on *voir dire* admitted he worked for the Department

---

[14]    Only Ray identified Petitioner during trial; Woods's identification occurred during his November 20 statement to police.

of Corrections, knew Detective Godoy, and may have known the murder victim, or someone

in his family." (Doc. 94 at 202.) The latter is a mischaracterization. During voir dire,

Simental told the court that he went to high school with a "Richard Gee." However, after the

court asked the victim's brother, Richard, to stand for identification, Simental said it was not

the same person. (Doc. 147-1 at 142-43, Ex. CCC (RT 10/13/93) at 141-42.)

Simental also said he may have talked to Godoy once or twice in connection with a

case in which a close friend had been killed. The following exchange then occurred:

> THE COURT: . . . By reason of your experience, Mr. Simental, you
> know Detective Godoy. Detective Godoy is the lead detective on this case.
> Detective Godoy will be sitting probably most of the trial with Mr. Peasley at
> counsel table. He will also testify at length as a witness in this trial. One
> question is: Would you have a tendency to give Detective Godoy's testimony
> more weight or less weight than some other witnesses by reason of your
> familiarity with him?
>
> VENIREMAN SIMENTAL: I don't think so due to the fact that at the
> time that I did just have a conversation with him. It was over the phone and it
> was just a brief conversation over some of the facts on his investigation, and
> that was about it.
>
> THE COURT: Okay.
>
> VENIREMAN SIMENTAL: Physically, I wouldn't even recognize the
> gentleman.
>
> THE COURT: Okay. And taking into consideration your employment
> experience, your life experience, would you, if you were the Defendant in this
> case, if you were sitting where Mr. Fong is, would you want someone with your
> attitude and frame of mind sitting as a juror, deciding the charge of first degree
> murder?
>
> VENIREMAN SIMENTAL: I wouldn't object to it. If the tables were
> turned around, I wouldn't object to it.
>
> THE COURT: As a Defendant, you think you would be a fair and
> impartial juror?
>
> VENIREMAN SIMENTAL: Yes, sir.
>
> THE COURT: And you could decide the case based only on the
> evidence that you hear during the trial and the Court's instruction on the law?
>
> VENIREMAN SIMENTAL: Yes, sir.

(*Id.* at 143-44, Ex. CCC at 142-43.)

The PCR court denied relief on Petitioner's claim that counsel was ineffective for not

striking Simental:

> Petitioner/defendant does not argue the court should have struck this juror for cause. That leaves the matter of exercising peremptory strikes to the discretion and judgment of the Petitioner/defendant's trial counsel. To weigh trial counsel's decision not to strike this juror requires a comparison of this juror with each of the jurors the Petitioner/defendant's trial counsel did strike. No such analysis is offered. Petitioner/defendant offers no evidence that the failure to strike this juror fell below a professional standard, nor does he offer evidence that the result would or even might have been different had trial counsel struck this juror and not struck a different juror.

(Doc. 144-3 at 145-46, Ex. X at 29-30.) Petitioner asserts that the state court made an "unusually narrow reading of the claim" by stating that Petitioner was not arguing that the court should have stricken the juror for cause, but does not otherwise explain how the decision was objectively unreasonable under either prong of § 2254(d). (Doc. 181 at 283.) Moreover, based on this record, the Court concludes there is no likelihood Petitioner would have prevailed had counsel moved to strike Simental. *See Styers v. Schriro*, 547 F.3d 1026, 1030 (9th Cir. 2008) (explaining that to establish prejudice, a petitioner must demonstrate a reasonable probability the motion would have been granted). The Court finds that the state court's ruling was not based on an unreasonable determination of the facts or application of law.

### 9. Notifying Mexican Consulate

Petitioner alleges ineffectiveness from counsel's failure to inform the Mexican Consulate that one of its citizens was facing three capital sentences. (Doc. 94 at 203.) It was undisputed that Petitioner was entitled to consular notification and did not receive it. In finding no prejudice, the court observed that Petitioner failed to proffer any mitigation information that may have been provided by the Consulate had counsel provided timely notification. (Doc. 144-3 at 129-31, Ex. X at 13-15.) Petitioner does not assert any specific arguments with respect to his burden under § 2254(d), and the Court finds that the state court's ruling was not based on an unreasonable determination of the facts or application of law.

### 10. Cumulative Prejudice and Evidentiary Development

Based on its determination of Petitioner's individual claims, the PCR court expressly found no cumulative effect from trial counsel's alleged deficiencies. (Doc. 144-3 at 179, Ex. Y at 28.) For the reasons set forth throughout Section IV, this Court finds that the state court's determination was not objectively unreasonable. The Court further concludes that Petitioner is not entitled to evidentiary development on any of these ineffectiveness claims because he had a full and fair opportunity to litigate the claims during the PCR evidentiary hearings and because he has failed to satisfy either prong of § 2254(d).

## V.    CLAIM F: INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL

Petitioner asserts that Stuehringer's deficient performance at trial "leached into direct appeal generally" and that counsel's conflict of interest from his representation of Peasley in disciplinary proceedings prevented him "from taking action to right the wrong of state misconduct." (Doc. 94 at 213.) He further argues that counsel failed to raise on appeal the following specific issues: (1) Godoy's perjured testimony; (2) Peasley's misconduct in arguing perjured testimony and misleading the jury; (3) the State's failure to investigate exculpatory leads; (4) the trial court's refusal to sequester the jury or change venue; (5) the state's elicitation of testimony that violated Petitioner's right to be free from self-incrimination; (6) the admission of gruesome photographs; (7) the admission of evidence stemming from an unlawful arrest; and (8) the admission of speculative hearsay from Richard Gee. (*Id.* at 215-18.) Respondents concede that allegations 1, 2, and 4 were properly exhausted in state court but contend that the remaining allegations were never raised. (Doc. 139 at 74-76.) The Court agrees.

The only appellate ineffectiveness claims raised by Petitioner in state court were based on Stuehringer's failure to argue on appeal the alleged Godoy perjury, Peasley misconduct, and prejudicial pretrial publicity.[15] (Doc. 143-2 at 39, 62, Ex. J at 36, 59.) Because Petitioner

---

[15]    Petitioner did assert that Stuehringer had a conflict of interest, but did not claim that this conflict affected his direct appeal. Rather, Petitioner argued that the conflict created a structural defect in his PCR proceeding. *See supra* Section III.

no longer has an available remedy to exhaust the factual basis of his remaining appellate ineffectiveness claims and has not established cause and prejudice or a fundamental miscarriage of justice to excuse the failure to properly exhaust, the Court finds that these claims are procedurally barred.

### A. Perjury/Prosecutorial Misconduct

Because the PCR court determined that Godoy neither committed perjury nor left the jury with a false impression, it found that Stuehringer was not ineffective for failing to raise this issue on appeal. (Doc. 144-3 at 169, Ex. Y at 18.) The court also summarily determined that counsel was not ineffective for failing to raise on appeal Petitioner's various prosecutorial misconduct allegations. (*Id.* at 176, Ex. Y at 25.) For the reasons set forth in Sections I.A.2 and IV.B.6, the Court finds that the state court's adjudication of these claims was not unreasonable.

### B. Sequestration/Change of Venue

In finding no ineffectiveness of appellate counsel, the PCR court ruled that Petitioner had failed to show that the appellate court would have found an abuse of discretion from the trial judge's denial of his motion to sequester the jury. (Doc. 144-3 at 137, Ex. X at 21.) The court further noted that Petitioner had not shown that any juror was improperly influenced during trial or ignored the court's admonitions about exposure to media. (*Id.*) With regard to the request to change venue, the PCR court determined that an appeal from denial of the motion would not have succeeded because Petitioner's claim was vague and failed to identify any specific jurors who were prejudiced by pretrial publicity. (*Id.* at 138-39, Ex. X at 22-23.) This Court agrees and finds that the state court's denial of these claims was not unreasonable. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000) (observing that relief available on appellate ineffectiveness claim only where advocacy fell below an objective standard of reasonableness and there is reasonable probability petitioner would have prevailed on appeal).

## VI. CLAIMS D, G-N & R: TRIAL ERRORS

### A. Admission of Third-Party Culpability Evidence

In Claim D Petitioner asserts that his rights to due process, to a fair trial, to present a defense, and to compel and confront witnesses were violated by the trial court's preclusion of evidence that (1) one of the victims had received a death threat weeks before the murders by someone who resembled Martin Garza, and (2) the fingerprint examiner was suffering from terminal cancer and was under the influence of mind-altering narcotic drugs at the time of the investigation. (Doc. 94 at 152.) Petitioner raised these claims on direct appeal.[16] Because the Arizona Supreme Court rejected each on the merits, Petitioner is entitled to habeas relief only if the state court's ruling was based on an unreasonable application of law or determination of fact.[17] 28 U.S.C. § 2254(d).

In reviewing this claim, the Court is guided by the Supreme Court's admonition that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). This principle dictates that a habeas petitioner cannot obtain relief for an erroneous state law evidentiary ruling unless it rises to the level of a deprivation of due process. *Id.* at 70. Therefore, to prevail on this

---

[16]     Respondents acknowledge that both allegations were raised on direct appeal but assert they were not presented as federal constitutional claims. (Doc. 139 at 51.) However, in his opening brief Petitioner expressly asserted that the preclusion of this evidence violated his rights to due process and confrontation under the United States Constitution and *Crane v. Kennedy*, 476 U.S. 683 (1986) (finding deprivation of right to fair trial by exclusion of evidence concerning defendant's confession). (Doc. 139, Ex. F at 47, 55.) Thus, the claims were properly exhausted.

[17]     Petitioner argues that AEDPA deference is inapplicable because the Arizona Supreme Court did not expressly address the federal constitutional underpinnings of his claims. (Doc. 181 at 225.) However, a state court may adjudicate the merits of a constitutional claim without citing federal precedent. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *Murdoch v. Castro*, 609 F.3d 983, 990 n.6 (9th Cir. 2010) (en banc) (plurality opinion). Petitioner argued in his opening brief that the trial court erred in precluding the evidence and that this erroneous preclusion violated his constitutional rights. The Arizona Supreme Court determined that the state court's preclusion ruling was not erroneous and thus implicitly found no constitutional violation. *Cf. Williams v. Cavazos*, No. 07-56127, 2011 WL 1945744, at *7-10 (9th Cir. 2011) (finding no adjudication on the merits by state court where prisoner raised two distinct legal arguments, state court addressed only one, and resolution of one not dispositive of other).

claim, Petitioner must show that exclusion of the proffered evidence resulted in an error so pervasive that it denied him a fundamentally fair trial. *See Chambers v. Mississippi*, 410 U.S. 284 (1973); *Jeffries v. Blodgett,* 5 F.3d 1180, 1193 (9th Cir. 1993) ("Habeas relief is available for wrongly admitted evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate federal due process.").

## 1. Dennis Tolander

At trial Petitioner sought to admit the testimony of Dennis Tolander, who had been in the El Grande Market weeks prior to the shooting and had overheard an Hispanic male threaten Fred Gee during a dispute "about money." (Doc. 191-1 at 4, Ex. 153 (RT 10/21/93) at 3.) After being shown a photo of Martin Garza, whom Petitioner alleged at trial was Cha-Chi, Tolander was uncertain but said the photo resembled the person who had threatened Gee. (*Id.* at 5, Ex. 153 at 4.) The trial court granted the prosecution's motion to preclude Tolander. On appeal Petitioner argued that Tolander's testimony was necessary to corroborate Woods's September 8 statement to police that Cha-Chi was the third murderer and Garza's testimony that he was friends with McCrimmon and moved shortly after the shootings. The Arizona Supreme Court found no abuse of discretion:

> The trial judge is afforded discretion to determine whether the probative value of relevant evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *State v. Williams,* 133 Ariz. 220, 230, 650 P.2d 1202, 1212 (1982) (quoting Ariz. R. Evid. 403). "The rule is that threats by a third person against a victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime." *Id.* (quoting *State v. Schmid,* 109 Ariz. 349, 356, 509 P.2d 619, 626 (1973)). Tolander's offered testimony indicates that he saw someone who resembled Garza threaten Gee, not that he saw Garza himself threaten Gee.
>
> Even assuming Tolander's testimony established that Garza threatened Gee, the trial court did not abuse its discretion in deciding there was no other evidence connecting Garza to the commission of the crime. Woods' September 8 statement, which defendant relies upon heavily, indicated that the third murderer was the "dude . . . [who] worked there." It is undisputed that Garza did not work at the El Grande. Also, the El Grande was in the process of closing at the time of the murders.[FN8] While the market was closing, customers could present themselves at the gate and, if they were recognized, they would be allowed in the store. Thus, as Woods' September 8 statement indicates, McCrimmon and Minnitt would most likely have been in the company of a

third individual who was known to Fred Gee. It was not an abuse of discretion to conclude that Woods' statement did not have an inherent tendency to connect Garza to the murders.

> FN8. Richard Gee, Fred Gee's brother, testified that Fred Gee would either lock the gate with the sliding bolt, lock it with a key, or do both during closing procedures. Kathy Lopez, who worked for Central Alarm, testified that Gee was scheduled to close at 9:00 p.m. on June 24, that she called Gee at about 9:40 p.m. to get an update, and Gee "said the usual thing, that he was going to be ten minutes late." Cynthia Sayre testified that it was Gee's practice, while closing the store, to stand at the liquor counter, count the money from the registers, and only admit customers who were recognized. At this time the gate would be closed, but the door of the store would remain open. After Gee counted the money, he would put it in cigarette cartons.

Additionally, Garza's fingerprints were not found in the store, while Fong's were. Although defendant claims his prints could have been left in the store when he worked there several months before, this does not explain the presence of his prints on unstamped food stamps found on the floor next to the body of Fred Gee. Testimony indicated that the food stamps would have been marked by the store on the day they were received. Also, the fingerprints found on the lemon and cucumber bags on the counter near Gee's body belonged to Fong, not Garza.

Although Fong may have touched baggies while working in the store months prior to the murders, or even while shopping in the store prior to the murders,[FN9] it is highly unlikely that Fong unrolled a spool of plastic bags, placed his prints on a baggie, and then rolled it back up on the spool. Likewise, assuming Fong touched bags that were lying around the store, it is unlikely that days, weeks, or even months after Fong touched those two particular bags, the killer entered the store, found those same bags, and used them to carry lemons and a cucumber to the liquor counter where Gee was shot.

> FN9. Fong's co-worker, Cynthia Sayre, testified that Fong quit working at the El Grande around September of 1991, about ten months before the murders. Sayre worked from 3:00 to 10:00 p.m. She saw Fong in the store shopping about four or five times after he quit working at the market, the last being around April of 1992, some two months before the murders.

Finally, Queen E. Ray identified "Martinez Fong," not Garza, as the Hispanic male who left with McCrimmon and Minnitt in her car shortly before the time of the murders, and returned without her car shortly thereafter. Although she referred to Fong as Martinez, not Martin, she identified Fong at trial. Apart from defendant's offer of proof regarding Tolander's vague recollection, the only evidence which connects Garza to the crime is his nickname: Cha-Chi. Because all of Woods' descriptions of Cha-Chi (including those in his September 8 statement) indicate that the Cha-Chi to whom Woods referred could not have been Garza, there was no evidence, apart from Tolander's offered testimony, with the inherent tendency to connect Garza to the crime. It was not an abuse of discretion for the trial court to exclude evidence of the threat.

*Soto-Fong*, 187 Ariz. at 199-200, 928 P.2d at 623-24.

The record fully supports the state court's findings that Tolander's testimony was not critical to the defense. Because Tolander was unable to positively identify Garza as the person he saw threatening Gee and no direct evidence connected Garza to the market murders, the exclusion of Tolander's testimony did not deprive Petitioner of a fair trial. Unlike the testimony excluded in *Crane v. Kennedy*, the evidence here was not "central" to Petitioner's case. 476 U.S. 683, 690 (1986). Accordingly, the Court rejects Petitioner's assertion that the state court's ruling was based on an unreasonable application of *Chambers* and *Crane*. (*See* Doc. 181 at 226-27.)

## 2. Fingerprint Examiner

Because the fingerprint evidence in this case was highly inculpatory, the defense sought to impeach Timothy O'Sullivan, the latent print examiner, with information regarding his medical condition and performance in a prior case. (Doc. 141-1 at 76-78, Ex. A at 426-28.) O'Sullivan was suffering from terminal cancer and taking pain medications during his involvement in the collection and processing of evidence from the crime scene.[18] (*Id.* at 78, Ex. A at 428.) In addition, O'Sullivan had been demoted as a result of a prior misidentification in a high-profile case. (*Id.* at 77, Ex. A at 427.) Petitioner argued that O'Sullivan's history of mistakes and his compromised mental state would have supported the argument that, although the latent prints found at the scene matched Petitioner, these prints were not lifted from the food stamps lying near Gee's body or the plastic bags found on the counter where Gee had been working. (Doc. 195-1 at 155, 167, Ex. 171 (RT 10/12/93) at 41,

---

[18] O'Sullivan died before trial. Consequently, the prosecution utilized a transcript of O'Sullivan's deposition and called as a witness a second identification technician, James Wallace, who conducted an independent fingerprint comparison. Wallace testified that he agreed with O'Sullivan's findings except that one of the three matching latents found on the bag containing the cucumber was actually inside the opening of the bag, not outside as O'Sullivan had noted. (Doc. 191-1 at 138-39, Ex. 153 (RT 10/21/93) at 137-38.) Wallace also disagreed with O'Sullivan that a latent lifted from the cucumber itself was a usable (but unidentified) print. (*Id.* at 140-41, Ex. 153 at 139-40.)

53.)

On appeal, the Arizona Supreme Court rejected Petitioner's challenge to the trial court's exclusion of evidence concerning O'Sullivan's medical condition:

> At the crime scene, Detective Godoy and Detective Wright shared the responsibility of collecting the evidence after it was photographed (which included the bags of lemons and the cucumber and the food stamps). O'Sullivan's function at the crime scene was to give suggestions concerning the photographing and packaging of evidence and to advise the detectives on what items needed to be processed. Detective Godoy and O'Sullivan put the bags with the lemons and the cucumber into evidence envelopes. Specifically, Godoy put the bag from which the lemons were taken in an envelope marked "From lemons" and the bag from which the cucumber was taken in an envelope marked "From cucumber." Detective Miller then sealed the envelopes.

> Although O'Sullivan removed the cucumber from its bag and dusted it for fingerprints at the crime scene, Godoy subsequently placed the cucumber in an envelope. Detective Godoy put the food stamps into an evidence envelope. [FN6] Detective Karen Wright prepared a map and log of the evidence taken from the scene and the locations of those items, and the log indicated that the "cucumber/lemons in baggie" were taken from the counter at the register in the liquor department.

> > FN6. Defendant contends in his reply that the credible testimony indicates the food stamp with Fong's print was taken from the cash register. Although Godoy did admit that he mistakenly told Judge Meehan [in a warrant application] that the food stamp came from the register, other testimony indicates that the only food stamps taken from the store were those found next to Gee's body.

> Defendant, as justification for his proffered impeachment of O'Sullivan, points to deviations from standard police procedure at the crime scene. One deviation was that several items, including those found on the counter near Fred Gee's body, were individually bagged in envelopes, then placed in a larger bag and may have been transported by O'Sullivan to the police station. This was a deviation insofar as the envelopes should have been transferred in the van driven by the I.D. technician and should not have been segregated from other items. Another alleged deviation was that the items taken from the murder scene were placed in a "drying room" at the police station which the detectives had "hijacked" to store bloody items. Defendant does not explain how these deviations tainted the evidence.

> Nor did defendant, in his offer of proof, adequately show how O'Sullivan's terminal illness, his prescription medicine, or his mood in any way related to whether the bags and food stamps were adequately sealed, transported, and tested or whether Detective Wright properly noted the location of the items on her map and log.[FN7] Defendant does not present a chain of custody issue.

> > FN7. Dr. Rosenberg, O'Sullivan's oncologist, noted no behavioral effects of Decadron on O'Sullivan. Also, although

the magnitude of O'Sullivan's grief upon learning of his terminal disease was "greater than average," Dr. Rosenberg testified that O'Sullivan's anxiety was typical of those suffering terminal illnesses.

The authority defendant cites does not support admission of his proffered impeachment evidence. In *State v. Hallman,* 137 Ariz. 31, 668 P.2d 874 (1983), this court held that the trial court did not abuse its discretion by allowing the state to bring out on cross-examination that defendant's brother, who testified on defendant's behalf at trial, had refused to honor a state subpoena. *Id.* at 35-36, 668 P.2d at 878-79. The court held that this evidence was relevant to show bias and that the scope of the impeachment was properly limited because the trial court only allowed the state to inquire with regard to the time period after the witness had been released from jail. *Id.*

In *Hallman,* the court held that a defendant has the right to introduce "evidence that may in the slightest degree affect the witness' credibility." 137 Ariz. at 36, 668 P.2d at 879. However, the court did so in the context of evidence concerning the bias of a witness. It is hardly analogous to argue that a defendant must be allowed to probe all areas relating to the mood or health of a witness, even though the defendant fails to show that the witness' mood or health related to the events in question.

*Soto-Fong*, 187 Ariz. at 197-98, 928 P.2d at 621-22.

With respect to O'Sullivan's misidentification of prints in a previous case, the Arizona Supreme Court found no error in excluding the evidence "because defendant does not even dispute that in this case O'Sullivan properly identified the prints in question as belonging to defendant." (*Id.* at 198, 928 P.2d at 622.)

Petitioner takes issue with the Arizona Supreme Court's observation that he failed to present a chain of custody issue, as well as the court's minimization of O'Sullivan's narcotic use and its conclusion that O'Sullivan's medical condition was irrelevant. (Doc. 181 at 211-12.) He also faults the court for "multiple unsupported secondary factual findings." (*Id.* at 228.) A review of the record supports the reasonableness of the state court's ruling.

At trial Petitioner brought out various deficiencies in the collection and documentation of the forensic evidence but, as noted by the supreme court, did not formally move to preclude it on chain of custody grounds. (*See, e.g.*, Doc. 195-1 at 163, Ex. 171 (RT 10/12/93) at 49.) Moreover, Petitioner did not challenge either the lifting procedures used by O'Sullivan or the accuracy of his print comparison. Indeed, Petitioner's own expert agreed with the match. (Doc. 191-1 at 161-62, Ex. 153 at 160-61.) Given the scope of Petitioner's defense—that the

latent prints were lifted from some other food stamp and plastic bags that were *not* near Gee's body—the Court agrees with the state court that neither O'Sullivan's medical condition nor his misidentification of a print in a prior case were critical pieces of impeachment evidence with regard to the manner in which the items with latent prints were collected.

## B.    **Admission of Hearsay Evidence**

In Claim G, Petitioner asserts that his rights to confront witnesses and to due process were violated by the trial court's admission of testimony concerning Keith Woods's November 20 statement.  (Doc. 94 at 222-23.)  He argues that, in contrast to the September 8 statement, the November 20 statement implicated someone other than the speakers and was also less reliable given the time that had passed and the publicity generated by Petitioner's arrest.  (*Id.* at 223.)  The Arizona Supreme Court denied this claim on direct appeal:

> Because the evidence demonstrated that Fong was not known as Cha-Chi, *see supra* note 2, defendant has consistently argued that Woods' September 8 statement to Godoy (that Cha-Chi was the third murderer) is admissible hearsay because it exculpates defendant.  Defendant maintains that Woods' later statements to Godoy that clarified Cha-Chi and Fong were the same person were not exculpatory as to Fong, were not self-inculpatory as to McCrimmon and Minnitt, and were thus inadmissible under *Williamson v. United States,* 512 U.S. 594, 114 S. Ct. 2431 (1994).  Defendant's argument misinterprets *Williamson*.
>
> In *Williamson,* the Supreme Court held that "[t]he question under Rule 804(b)(3) is **always** whether the statement was sufficiently against the **declarant's** penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true'. . . ."  512 U.S. at 606, 114 S. Ct. at 2438 (footnote omitted) (emphasis added).  Thus, according to *Williamson,* the 804(b)(3) issue is whether the statements were inculpatory as to McCrimmon or Minnitt, not as to Fong.  *See State v. Nieto,* 186 Ariz. 449, 924 P.2d 453 (App.1996) ("To determine if a statement is truly against interest requires a fact-intensive inquiry of the surrounding circumstances and each declaration must be scrutinized to determine if it is self-inculpatory in light of the totality of circumstances.").  Woods' September 8 version of the statements (that the third murderer was Cha-Chi who "used to work there"), which defendant claimed was admissible, and Woods' later version that Cha-Chi was "Martin, Betty Christopher's boyfriend" were equally non-self-inculpatory with regard to McCrimmon and Minnitt, the hearsay declarants.
>
> Woods' testimony as to the identity of the third murderer was based solely on a conversation Woods had with McCrimmon and Minnitt on the day Woods was released from jail.  Defendant maintains that he should have been permitted to introduce some of Woods' descriptions of this conversation but to exclude other descriptions of the same conversation from the same witness.  The

trial court simply ruled that if defendant introduced some of what McCrimmon and Minnitt told Woods about the third murderer, the state would be permitted to introduce Woods' other statements about what McCrimmon and Minnitt told him in the same conversation. The trial court's decision is the correct approach. *See State v. Woratzeck,* 134 Ariz. 452, 454, 657 P.2d 865, 867 (1982) (holding defendant opens the door to further inquiry on a topic by introducing that topic in its examination of a witness); *State v. Mincey,* 130 Ariz. 389, 405, 636 P.2d 637, 653 (1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982) (noting "Arizona follows the English or 'wide open' rule, wherein cross-examination may extend to all matters covered by direct examination . . ." and holding defendant opened the door to evidence relating to his selling heroin by mentioning in opening that he was a heroin addict).

Defendant attempts to question the credibility of McCrimmon and Minnitt. The reasons for doubting the veracity of McCrimmon and Minnitt arguably support excluding their statements entirely but do not justify admitting only those portions that benefit defendant. For example, defendant contends McCrimmon and Minnitt were friends with Woods, they were blame-shifting, and the statements in question were non-self-inculpatory. However, these same factors apply to Woods' September 8 version of his conversation with McCrimmon and Minnitt, which defendant has consistently maintained is admissible and which defendant himself introduced.

Defendant also claims the statement by McCrimmon and Minnitt is internally inconsistent. He points out that they told Woods Cha-Chi was used to gain entrance to the store, which was in the process of closing. Cha-Chi was able to convince the victims to let him in the store because he had worked there and was known to the victims. Defendant claims this statement contradicts other statements *by Woods* indicating Cha-Chi wore a mask when he entered the store. Defendant ignores the fact that Woods testified that he said Cha-Chi went in "masked down **or whatever**" because he, Woods, had simply assumed, without knowing, that Cha-Chi had worn a mask. Testimony does not demonstrate, as defendant contends, that McCrimmon and Minnitt told Woods that Cha-Chi wore a mask. The testimony simply demonstrates that Woods assumed a mask was worn.

Had the issue been raised, it may very well be that all of McCrimmon's and Minnitt's statements concerning Cha-Chi would have been held inadmissible. *Williamson* indicates that only those statements within a confession "that are individually self-inculpatory" are admissible under Rule 804(b)(3). 512 U.S. at 599, 114 S. Ct. at 2435 ("We see no reason why collateral statements, . . . even ones that are neutral as to interest, . . . should be treated any differently from other hearsay statements that are generally excluded."). *Cf. State v. Daniel,* 169 Ariz. 73, 74, 817 P.2d 18, 19 (App.1991), *cert. denied,* 502 U.S. 1121, 112 S. Ct. 1243 (1992) ("In short it was not necessarily against [declarant's] penal interest to inculpate appellant, and he may have believed it would further his own interest by creating the possibility of a 'deal' with police."). However, once defendant made the tactical decision to introduce some of Woods' testimony about the August conversation, he could not simultaneously preclude the state from introducing other evidence of that same conversation. Rather than have the state bring out the challenged portion, defendant sought to "draw the sting" by bringing it in himself.

Nor will we second-guess trial counsel's tactical decision to introduce

- 68 -

evidence that the murderer was Cha-Chi, even at the expense of opening the door to Woods' later statements. Fingerprint evidence and other testimony connected defendant to the crime. It is understandable that defense counsel would want to raise the issue of whether Cha-Chi, a person other than Fong, committed the murders, even at the expense of other evidence indicating that "Cha-Chi" was Fong. Having chosen a strategy which brought into issue portions of McCrimmon's and Minnitt's statements to Woods, defendant cannot complain that the court should have precluded the state from introducing additional portions of those same statements.

. . . .

Defendant makes a secondary argument concerning the Woods testimony. He argues that *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, constitutionally entitled him to introduce the September 8 statements (presumably without the risk of the state introducing the November 20 statements) because those statements were exculpatory as to Fong. This argument misses the mark for several reasons. First, defendant continues to ignore the fact that the September 8 statement was at least partially inculpatory as to Fong. As noted above, Woods told police on September 8 that McCrimmon and Minnitt said Cha-Chi was a former employee of the El Grande Market. *See supra* Trial Issue I.A. This, in effect, excluded Martin Garza, who, the defense claimed, was the "real" Cha-Chi, but included Fong.

Second, this case does not raise a *Chambers* problem because defendant was not prevented from introducing exculpatory evidence. No one sought to prevent defendant from using the September 8 statement. The trial judge simply ruled that if portions of the August conversation were introduced, the state would not be precluded from introducing other explanatory portions.

Finally, we believe defendant reads *Chambers* too broadly. *Chambers* did not hold that trial judges must always admit exculpatory hearsay. Instead, in *Chambers,* the Court was careful to point out that the hearsay statements which should have been admitted by the trial court in that case were "offered at trial under circumstances that provided considerable assurance of their reliability." 410 U.S. at 300, 93 S. Ct. at 1048. What defendant ignores is that in *Chambers,* as in *Williamson,* the reliability inquiry is focused on the hearsay declarants. *Id.* Defendant's position, that McCrimmon and Minnitt were reliable in only those statements that assist defendant's case, has no factual or legal basis.

Defendant proceeds to attack Woods' credibility, but this inquiry misses the mark as well. Even if Woods were the hearsay declarant, what defendant would need to demonstrate (and what he attempted to show in his brief and at argument) is that Woods was unreliable in his later statements but reliable on September 8. Defendant fails in this regard because the factors to which defendant points as demonstrating Woods' unreliability apply to all of Woods' statements; not simply those defendant seeks to exclude.[FN4]

FN4. Defendant has consistently argued that Woods' September 8 statement was reliable because it was given "when Woods was facing a 25-year sentence on his own charges and was highly motivated to cooperate with the detectives." Defendant argues that courts should view with some skepticism "statements made

with an eye to obtaining a 'deal with the government,' " citing
*United States v. Magana-Olvera,* 917 F.2d 401, 408 (9th Cir.1990). Defendant ignores the fact that all of Woods' statements were "made with an eye to obtaining a deal with the government." To the extent that Woods was unreliable because he made a deal to avoid prison, he was just as unreliable on September 8 as on November 20. His motivation was constant once he made his bargain with the police. Defendant also argues that declarations implicating someone other than the speaker are less reliable, that McCrimmon and Minnitt were speaking to a friend who they did not expect to use the statements against them, that the three had known each other for years, and that McCrimmon and Minnitt made Cha-Chi out to be the ringleader. None of these factors address the issue of whether the post September 8 statements are unreliable.

*Soto-Fong*, 187 Ariz. at 193-195, 928 P.2d at 617-19.

Petitioner argues that the state court's ruling is unreasonable because it improperly assumed Woods's November 20 statement was based on his conversation with McCrimmon and Minnitt. (Doc. 181 at 306.) Instead, according to Petitioner, Woods's statement was derived from an unrecorded conversation with Godoy, who fed him the identifying information implicating Petitioner and was thus the hearsay declarant. (*Id.* at 304.) The Court summarily rejects this argument because it is both patently meritless and based on evidence (the 2005 declaration of Keith Woods) that was not before the state court when it adjudicated the claim. *See Pinholster*, 131 S. Ct. at 1398.

## C.    Juror Misconduct

In Claim H, Petitioner contends that his rights to due process and an impartial jury were violated by juror misconduct. Specifically, he asserts that Juror Cisneros revealed that one of the jurors, likely Juror Simental, used his experience as a prison guard to influence other jurors. (Doc. 94 at 225.) In addition, during trial Juror Ruehl saw spectators flash gang signs at Keith Woods during his testimony. (*Id.* at 226.) The parties dispute whether Petitioner properly exhausted this claim as a federal constitutional violation. Regardless, the claim is meritless.

In denying relief, the PCR court noted that Juror Ruehl "did nothing wrong and the actions of those she observed cannot be imputed to her. Her statement that she did not believe

her observations swayed her testimony (sic) must be taken at face value." (Doc. 144-3 at 147, Ex. X at 31 (footnote omitted).) Petitioner has not provided her statement to this Court nor proffered any evidence to support his claim of juror misconduct with respect to the flashing of gang signs.[19]

Regarding Juror Cisneros, the PCR court observed that Petitioner provided no evidence of the type of juror misconduct proscribed by Rule 24.1(c)(3) of the Arizona Rules of Criminal Procedure: receiving evidence not admitted at trial, deciding the verdict by lot, lying during voir dire, receiving a bribe, becoming intoxicated, or conversing about the outcome of a case before the verdict is rendered. (*Id.* at 146-48, Ex. X at 30-32.) Rather, the information from Cisneros implicated the subjective motives or mental processes that led him to assent to the verdict; as such, it was prohibited by Rule 24.1(d). (*Id.* at 148, Ex. X at 32.)

Petitioner argues that introduction into the deliberations of a juror's prison guard experience constitutes an improper external influence that affected the jury's verdict. (Doc. 181 at 309.) The Court disagrees. In discussing the prison guard, Juror Cisneros told a defense investigator that this juror "had made up his mind" before deliberations began, that he commented on dealing with criminals every day, and that he influenced other jurors. (Doc. 47, Ex. 77 at 8-10.) Cisneros said this juror believed from the outset Petitioner should be "hang[ed]" and was "guilty as sin," but Cisneros also acknowledged "[the prison guard] didn't say that, but uh, I mean, that's the attitude that I, that I, that I took from him, you know." (*Id.* at 11.) Nothing in Cisneros's statement evinces the type of extraneous information that may be used to impeach a verdict. *See Tanner v. United States*, 483 U.S. 107, 117 (1987); *see also Grotemeyer v. Hickman*, 393 F.3d 871, 878 (9th Cir. 2004) (finding no impropriety from jury foreman, a physician, expressing her opinion that mental illness caused defendant to commit the crime and prison would provide adequate mental health care).

**D.**     **Motion for New Trial**

---

[19]     Petitioner appended Ruehl's interview transcript as an exhibit to his state PCR petition, but neither party provided that exhibit to this Court.

In Claim I, Petitioner asserts that his right to due process was violated when the trial court denied his motion for new trial based on newly-discovered evidence—Christopher McCrimmon's testimony at his own trial denying involvement in the murders and claiming that Petitioner, who was not known as Cha-Chi, was just an acquaintance. Petitioner raised this claim on direct appeal.[20] In denying relief, the state court ruled:

> The trial court is in the best position to evaluate the potential effect upon the jurors of newly discovered evidence. *State v. Medrano,* 173 Ariz. 393, 399, 844 P.2d 560, 566 (1992). It was well within the trial court's discretion to have determined that McCrimmon's testimony would probably not have changed the verdict. *See State v. Fisher,* 141 Ariz. 227, 251, 686 P.2d 750, 774, *cert. denied,* 469 U.S. 1066, 105 S. Ct. 548 (1984) ("[I]f the motion [for new trial] relies on the existence of a witness willing to testify and present the new evidence at a new trial, such witness must appear to be credible to the trial judge hearing the motion."). Defendant's strategy at trial was to show that he was not involved in the murders or the robbery of the market. McCrimmon's testimony (apart from that which is cumulative, discussed *infra* ) was that he was by himself when Ray loaned him the car, he was not involved in the shootings, he was in the area to purchase drugs, and he knew Fong only as an acquaintance.
>
> McCrimmon's denials amounted to nothing more than a repetition of defendant's own position that he was not involved in the crime in any way. McCrimmon's jury rejected his testimony and found him guilty of murder and robbery. More importantly, McCrimmon's testimony did not offer anything new in the way of support as to why defendant's theory of the case was the one the jury should accept. At least a portion of McCrimmon's "new" testimony was cumulative. Testimony that Fong was not known as Cha-Chi and that Cha-Chi was Martin Garza was introduced at Fong's trial. Fong's family and friends testified that he was not known as Cha-Chi, and Garza himself testified that he was known as Cha-Chi and that he sold drugs.
>
> Fong's jury was presented with substantial evidence of Fong's guilt. This evidence included: (1) Fong's fingerprints on items found on the counter and floor where the murders took place; (2) Ray's testimony that Fong was with McCrimmon and Minnitt when she loaned them the car found near the scene of the murder and was with them when they returned shortly after the murder; (3) Woods' testimony that the third murderer was "Martin," "the Mexican dude," who "used to work there;" (4) the uncontested fact that Fong was a former employee of the market; and (5) the testimony that the store was closing at the time of the crime and only a person recognized by the victims could have

[20]     Respondents acknowledge that the claim was raised on direct appeal but assert it was not presented as a federal constitutional violation. (Doc. 139 at 87.) However, in his opening brief Petitioner expressly asserted that the "denial of the motion for new trial violated fundamental fairness ensured by the due process clause of the Fourteenth Amendment." (Doc. 139, Ex. F at 41.) Thus, the claim was properly exhausted.

> gained admission.  McCrimmon's complete denial of involvement, essentially nothing more than a repetition of Fong's unsuccessful trial strategy, would probably not have swayed the jury.  We certainly cannot say that the trial judge abused his discretion in denying the motion for new trial based on newly discovered evidence.

*Soto-Fong*, 187 Ariz. at 196, 928 P.2d at 620 (footnote omitted).

Petitioner first asserts that AEDPA deference does not apply because the Arizona Supreme Court ruled only on state law grounds, without reference to federal caselaw or the United States Constitution. (Doc. 181 at 321.) In *Williams v. Cavazos*, No. 07-56127, 2011 WL 1945744, at *7-10 (9th Cir. 2011), the Ninth Circuit found that a state court's ruling on a petitioner's state law claim was not also an adjudication on the merits of a companion Sixth Amendment claim.  However, in that case the petitioner raised in state court two distinct legal arguments, separately supported by state and federal law.  *See id.* at *7 & n.8.  Here, in contrast, Petitioner argued that the trial court abused its discretion under Rule 24.2 of the Arizona Rules of Criminal Procedure and simply concluded that the failure to grant the motion under this rule denied him due process.  As with Claim D, *see supra* note 17, the Court finds that the Arizona Supreme Court's denial of this claim constitutes an adjudication on the merits because it implicitly found no due process violation when it determined that the trial court's denial of the motion was not erroneous.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (holding that a state court may adjudicate the merits of a constitutional claim without citing federal precedent).

Petitioner next asserts in a conclusory fashion that the state court's ruling was based on an unreasonable application of *Woodson v. North Carolina*, 428 U.S. 280, 292-93 (1976), and *Chambers v. Mississippi*, 410 U.S. at 284. (Doc. 181 at 321.)  However, neither of these cases provides for a due process violation from the failure to grant a new trial motion based on newly-discovered evidence.  In *Woodson*, the Court struck down North Carolina's mandatory capital sentencing statute as a violation of the Eighth Amendment.  428 U.S. at 292-93.  In *Chambers*, the Court found a violation of due process based on the trial court's exclusion of exculpatory hearsay testimony and limitation of the defendant's cross-

examination of an alternate suspect. 410 U.S. at 302. Because Petitioner has not identified any Supreme Court precedent that required the trial court to grant him a new trial under the circumstances of this case, he cannot satisfy the requirements of 28 U.S.C. § 2254(d)(1). *See Musladin*, 549 U.S. at 76-77; *Moses v. Payne*, 555 F.3d 742, 758-59 (9th Cir. 2009).

Moreover, although Petitioner invokes the concept of federal due process, his claim is clearly premised on issues of state law. Indeed, he cites state law and asserts that the "relevant inquiry under due process and Arizona Criminal Procedure Rule 24.2, is whether the testimony 'would probably change the verdict if a new trial were ordered.'" (Doc. 94 at 232.). However, state law claims are not subject to habeas review. *See Estelle,* 502 U.S. at 67-68. To establish a constitutional due process claim, Petitioner must demonstrate that the trial court's denial of his motion for new trial was so egregious that it violated his right to a fundamentally fair trial. *Id.* at 73; *Pulley v. Harris*, 465 U.S. 37, 41 (1984). The state court's ruling here was not so egregious because Petitioner presented other evidence at trial establishing that he was not known as Cha-Chi, that McCrimmon's friend Martin Garza was known as Cha-Chi, and that Petitioner did not socialize with McCrimmon. Thus, the new evidence from McCrimmon was not critical to the defense and the failure to grant a new trial on this ground was not fundamentally unfair.

## E. Reasonable Doubt Instruction

In Claim J, Petitioner alleges that the trial court's refusal to define reasonable doubt deprived him of due process. (Doc. 94 at 234.) At trial, the court instructed the jury:

> The State must prove the defendant guilty beyond a reasonable doubt. This means the State must prove each element of the charge beyond a reasonable doubt. If you conclude that the State has not met its burden of proof beyond a reasonable doubt, then reasonable doubt exists and the defendant must be acquitted of that charge.

(Doc. 189-1 at 195, Ex. 150 (RT 10/26/93) at 194.) On appeal, Petitioner argued that the trial court's failure to give further instruction defining reasonable doubt violated his federal right to due process. (Doc. 139, Ex. F at 52.) In denying this claim, the Arizona Supreme Court noted that, although for future cases the court had recently directed trial courts to provide a

standard instruction explaining the concept of reasonable doubt, it previously held "there is no requirement that a trial court define reasonable doubt for the jury." *Soto-Fong*, 187 Ariz. at 198, 928 P.2d at 622. Therefore, the court declined to grant appellate relief. *Id.*

"The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Id.* (internal quotation and citations omitted). Here, the trial court instructed the jury that the State must prove each element of the charge beyond a reasonable doubt. This was sufficient to satisfy due process. Thus, the Arizona Supreme Court's adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law.[21]

## F.    Premeditation Instruction

Petitioner concedes that Claim K—alleging an unconstitutional premeditation instruction—was not properly exhausted in state court and is thus not properly before the Court for consideration on the merits. (Doc. 181 at 332.) Because Petitioner does not assert cause and prejudice or a fundamental miscarriage of justice to excuse the default, this claim is procedurally barred.

## G.    Notice to Consulate

In Claim L, Petitioner asserts that the State's failure to notify the Mexican consulate of his arrest and prosecution for capital murder violated his rights under the Vienna Convention for Consular Relations. (Doc. 94 at 240.) The Arizona Court of Appeals

---

[21]    Petitioner asserts that the Arizona Supreme Court failed to reach the merits of his federal claim because it relied on *State v. Bracy*, 145 Ariz. 520, 535, 703 P.2d 464, 479 (1985), in finding no requirement that a trial court define reasonable doubt. However, *Bracy* itself cites to both state and federal law for this proposition. *See id.*

addressed this claim during Petitioner's second PCR proceeding:

> Fong argues the trial court erred when it denied his claim for relief based on the state's violation of his right as a Mexican national to consular notification under the Vienna Convention on Consular Relations (VCCR). The trial court held the claim was precluded as having been raised in his first Rule 32 petition. But Fong argues that an interim decision of the International Court of Justice and a subsequent Presidential Determination that state courts must give effect to the decision entitled him to a hearing on this claim. *See Case Concerning Avena and Other Mexican Nationals (Mexico v. United States)*, 2004 I.C.J. 12 (Mar. 31). *Avena* requires courts to provide review and reconsideration of severe sentences with respect to violations of the VCCR. *Id.* at 73. And the Presidential Determination orders state courts to give effect to *Avena* "in accordance with general principles of comity."

> Fong has been provided a meaningful review of his sentences with respect to the VCCR violation. He raised it in his first Rule 32 petition. The claim was briefed by both parties and Mexico as amicus curiae and the court heard oral argument on the claim. Because the claim could have been raised at trial or on appeal, the trial court, pursuant to a comment to the version of the rule in effect at the time, analyzed whether Fong had suffered prejudice by his counsel's failure to raise the claim. *See* 170 Ariz. LXVII-LXVIII (former Rule 32.2(a)(3), cmt.). The trial court found Fong had suffered no prejudice as a result of the violation because Fong had based his claim of prejudice on what the Mexican government could have provided as mitigation evidence at trial, but none of the mitigation evidence subsequently provided in support of the petition appeared to have come from the Mexican government. The review required by *Avena* consists of "ascertaining whether in each case the violation of [the VCCR] committed by the competent authorities caused actual prejudice to the defendant in the process of the administration of criminal justice." 2004 I.C.J. at 60. Because the trial court made that determination when it denied relief on Fong's first Rule 32 petition, we conclude Fong has been provided review of his sentence in the context of the VCCR violation and the trial court did not err in denying his claim for relief on that basis.

(Doc. 146-3 at 83-84, Ex. WW at 17-18 (footnotes omitted).)

Petitioner summarily asserts that the state court's ruling is not entitled to deference under AEDPA because the court failed to grant an evidentiary hearing to determine prejudice. (Doc. 181 at 340.) However, Petitioner stipulated during his first PCR proceeding that an evidentiary hearing on this claim was unnecessary. (*See* Doc. 144-3 at 121, Ex. X at 2.) As already discussed, Petitioner received the effective assistance of trial counsel, and he does not otherwise specify how additional resources from the Mexican government would have affected the outcome of his trial. The state court's finding that Petitioner failed to show any harm from the lack of notification to the Mexican consulate was not objectively unreasonable.

## H. Insufficiency of Evidence

In Claim M, Petitioner alleges that the evidence against him was constitutionally insufficient to support his conviction. (Doc. 94 at 251.) On direct appeal, Petitioner argued that Woods and Ray provided no credible evidence of guilt and that the fingerprint evidence alone was insufficient to convict him. The Arizona Supreme Court disagreed:

> This court is not empowered to impose its own determination as to the credibility of Woods and Ray in deciding a Rule 20 motion. The only question before this court is whether there was substantial supporting evidence, and we conclude that there was. McCrimmon and Minnitt told Woods they robbed the market with the "dude" who "set it up." Woods explained that McCrimmon and Minnitt had described Cha-Chi as "Martin. . . . Betty Christopher's boyfriend." Fong had worked at the El Grande within a year of the murders and his girlfriend was Betty Christopher. Fong's fingerprints matched prints found on the produce bags and one of the food stamps found near Gee, who had apparently been ringing up a last-minute sale when he was shot.
>
> Queen E. Ray loaned McCrimmon her car on the night of the murders. Minnitt and Fong were with McCrimmon when he left with her car. About an hour later the trio returned without the car. Meanwhile, police investigating the scene found Ray's car abandoned three blocks from the El Grande Market. The car was not parked near the curb, but was left mid-turn. The hood was warm to the touch, the doors unlocked, and the rear windows rolled down. McCrimmon's fingerprints were found on the outside of the driver's side window, and two sets of hand prints were found on the car's trunk.
>
> The evidence is more than sufficient to withstand a Rule 20 motion for acquittal.

*Soto-Fong*, 187 Ariz. at 200-201, 928 P.2d at 624-25.

Petitioner argues that the state court failed to address his federal constitutional claim and instead ruled only on state law grounds. (Doc. 181 at 348.) Regardless, Petitioner's claim fails.

In reviewing a claim of insufficient evidence to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In reaching a determination as to the sufficiency of the evidence, this Court may not substitute its determination of guilt for that of the factfinder and may not weigh the credibility of witnesses. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993); *Schlup v. Delo*, 513 U.S. 298, 330 (1995). Despite these legal principles, Petitioner argues it "was evident at trial" that Woods

and Ray committed perjury and that the fingerprint evidence was unreliable.  (Doc. 181 at 343-344.)  The Court summarily rejects this argument and finds that a rational juror could have found Petitioner guilty beyond a reasonable doubt based on the evidence introduced at trial.

## I.      **Change of Venue**

In Claim N, Petitioner contends that he was deprived of due process and a fair trial by the state court's failure to grant his motion for a change of venue or to sequester the jury. (Doc. 94 at 257.)  Respondents assert that this claim is procedurally barred.  (Doc. 139 at 101.)  The Court agrees.

Petitioner raised this claim in his first PCR petition.  (Doc. 143-2 at 59, Ex. J. at 56.) Before ruling on Petitioner's individual claims, the PCR court noted that under Arizona's Rule 32.2(a)(3), a defendant is procedurally precluded from relief on any claim that has been waived at trial, on appeal, or in a previous collateral proceeding.  (Doc. 144-3 at 124, Ex. X at 5.)  The court further noted that if a claim is of "sufficient constitutional magnitude," a knowing, voluntary, and intelligent waiver by the defendant is required.  However, "[i]f the claim is of a lesser magnitude then failure to raise it on appeal or prior Rule 32 petition results in preclusion by waiver" and the claim would be analyzed only "in the context of a claim for ineffective assistance of counsel."  (*Id.*)  Subsequently, the court determined that Petitioner's change-of-venue claim fell into this latter category and declined to review it on the merits; instead the court considered only whether appellate counsel rendered ineffective assistance for failing to raise it on appeal.  (*Id.* at 137, Ex. X at 21.)

Invoking independent and adequate state grounds, the state court exercised its discretion and declined to address the merits of Petitioner's new allegations.  Therefore, Claim N is procedurally defaulted.  Because as discussed below Petitioner has established neither cause and prejudice nor a fundamental miscarriage of justice, this claim is procedurally barred.

## VII.    CLAIMS O & P:  POSTCONVICTION ERRORS

Petitioner argues that his right to due process "was and continues to be" violated in collateral proceedings. (Doc. 94 at 258.) Specifically, he asserts that Stuehringer's conflict of interest, Pima County's inability to provide a neutral forum (evidenced by 10 judges recusing themselves from PCR proceedings), and the PCR and appellate courts' misapplication of its own rules and denial of evidentiary development amount to structural defects affecting reliability of the PCR proceedings. (*Id.* at 258-66.) Petitioner also argues that the state PCR judge was biased against him, in violation of his rights to due process, fundamental fairness, and to be free from cruel and unusual punishment. (*Id.* at 269.)

As already discussed with respect to Claim C in Section III, *supra*, the Ninth Circuit has held that procedural errors arising during collateral-relief proceedings are not cognizable in habeas corpus proceedings under 28 U.S.C. § 2254 because they do not challenge a petitioner's detention. *Cooper*, 641 F.3d at 331-32; *Franzen*, 877 F.2d at 26; *see also Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th Cir. 2004) (holding that a constitutional claim predicated on a state judge's failure to recuse in a state post-conviction proceeding is not appropriate on federal habeas review because "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief"). Accordingly, Claims O and P are denied as failing to state cognizable claims for federal habeas relief.

## VIII. CLAIM Q: ACTUAL INNOCENCE

Petitioner asserts that newly-discovered evidence establishes that he is actually innocent and thus his continued incarceration violates the federal constitution. (Doc. 94 at 275.) He argues that a "holistic review" of the following establishes innocence: (1) the confession of Carole Grijalva exculpating McCrimmon, Minnitt, and Fong; (2) Godoy's perjury; (3) Peasley's disbarment; (4) Stuehringer's conflict of interest; (5) Woods's admission that Godoy and Peasley falsified his statements and that he testified falsely; (6) Woods's girlfriend's claim that Godoy shaped Woods's statements and permitted him to continue selling drugs; (7) *Brady* violations; and (8) McCrimmon's declaration exculpating

Petitioner. (*Id.* at 275-77.) Petitioner asserts innocence as both a substantive "freestanding" constitutional claim and as a gateway to excuse any procedurally defaulted claims.

### A. Freestanding Claim

Respondents assert that Petitioner's actual innocence claim was not exhausted in state court. (Doc. 139 at 109.) Respondents also argue that a claim of actual innocence "is not itself a constitutional claim." (*Id.*) Because the Court agrees with this latter assertion and also finds that the claim lacks merits, it need not reach the alleged procedural default.

In *Herrera v. Collins*, 506 U.S. 390, 398-99 (1993), the United States Supreme Court left unresolved the question of whether the execution of an innocent person would violate the Eighth Amendment absent an independent constitutional violation occurring in the state trial. The Court revisited the issue in *House v. Bell*, 547 U.S. 518, 555 (2006), again without resolving the question:

> We conclude here, much as in *Herrera*, that whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it. To be sure, House has cast considerable doubt on his guilt—doubt sufficient to satisfy *Schlup's* gateway standard for obtaining federal review despite a state procedural default. In *Herrera*, however, the Court described the threshold for any hypothetical freestanding innocence claim as "extraordinarily high." . . . *Herrera* requires more convincing proof of innocence than *Schlup*. It follows, given the closeness of the *Schlup* question here, that House's showing falls short of the threshold implied in *Herrera*.

*Id.* Most recently, the Court transferred an original petition for habeas corpus to a district court for an evidentiary hearing on "whether evidence that could not have been obtained at the time of trial clearly establishes petitioner's innocence," but did not affirmatively hold that proof of innocence would entitle the prisoner to habeas relief. *In re Davis*, 130 S. Ct. 1 (2009) (mem.) Importantly, *Herrera*, *House*, and *Davis* were capital cases.

Here, Petitioner has been resentenced to life imprisonment and is no longer under a sentence of death. Although he argues that life imprisonment is akin to a death sentence for someone his age, the fact that the Supreme Court has yet to find that execution of an innocent person would violate the federal constitution supports this Court's finding that no such claim exists for someone facing a term of life imprisonment. Indeed, Petitioner does not cite any

caselaw to support his assertion that lifetime incarceration of an innocent person constitutes an independent federal constitutional violation, and the Ninth Circuit has expressly found no basis for habeas relief in at least one non-capital case. *See Coley v. Gonzales*, 55 F.3d 1385, 1387 (9th Cir. 1995); *see also Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007) ("[O]ur precedent forbids granting habeas relief based on a claim of actual innocence . . . in non-capital cases."); *Wright v. Stegall*, 247 Fed.Appx. 709, 712 (6th Cir. 2007) ("Since the Supreme Court has declined to recognize a freestanding innocence claim in habeas corpus, outside the death-penalty context, this court finds that petitioner's claim is not entitled to relief under available Supreme Court precedent.").

Even if a freestanding claim is amenable to federal habeas review in a non-capital case, the new evidence proffered in this case cannot satisfy *Herrera*'s "extraordinarily high" hypothetical standard. 506 U.S. at 417. In *Schlup*, the Court stated that a credible claim of innocence requires presentation of "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Petitioner has proffered an article in *The New Yorker* about Peasley's disbarment in which Carole Grijalva-Figueroa is quoted as telling an investigator that McCrimmon, Minnitt, and Fong had nothing to do with the Market murders. (Doc. 47, Ex. 67 at 63.) According to the transcript of her interview with the investigator,

> in June, 1992, a friend learned that about sixty-five pounds of cocaine that he partly owned had been stolen—and that "the El Grande guy" had tipped off the people who took it. As a result, her friend and two other men went to the store on the night of June 24th to exact retribution. "I was supposed to be the lookout," she said, adding that she waited in a gold Cadillac while three men went inside.
>
> "I sat and I waited. Heard a bunch of yelling. And I heard shots," she said, according to the transcript. She drove the three men from the scene, and I heard one of them say, "Did you see I got that motherfucker point-blank?"

(*Id.*) However, during his second PCR proceeding, Petitioner was unsuccessful in his

attempts to obtain a copy of Grijalva-Figueroa's statement or to secure her cooperation.[22] (*See* Doc. 93-3 at 1-14, Exs. 106-09.) Consequently, the only evidence to support Petitioner's alternative suspect theory is a magazine article, which is hardly "new reliable evidence." *Schlup*, 513 U.S. at 324.

The Court is also unpersuaded by the other "evidence" on which Petitioner relies. As explained above, Petitioner's prosecutorial misconduct and *Brady* claims lack merit. The fact that misconduct occurred in the McCrimmon and Minnitt trials does not amount to new reliable evidence exonerating Petitioner. Similarly, the Court does not find the declarations from McCrimmon and Woods to be persuasive evidence of innocence. McCrimmon denies ever telling Woods that someone named Cha-Chi, Martin, or Martin Soto Fong was involved in any crime. (Doc. 93-2 at 214, Ex. 100.) Woods now claims "the person that originally told me about what happened inside the El Grande told me 'Cha-Chi' was involved but did not otherwise identify him in any way." (*Id.* at 206, Ex. 98 at 2.) Neither of these declarations is sufficient to demonstrate actual innocence in the face of the forensic evidence and testimony from Queen Ray identifying Petitioner as being with McCrimmon when Ray borrowed her boyfriend's car the night of the offense. Petitioner's argument that the fingerprint evidence is inherently unreliable is based solely on conjecture, and he has made no attempt to substantiate the bald allegation his prints were planted.[23]

### B. <u>Miscarriage of Justice Gateway</u>

---

[22] At the time of the PCR proceeding, Grijalva-Figueroa was being prosecuted for first degree murder and her counsel relayed to Petitioner's PCR counsel that his client did not want to involve herself in Petitioner's case. (Doc. 93-3 at 10, Ex. 108 at 4.)

[23] The Court notes that latent prints from the food stamp and plastic bags were photographed and lifted on June 29, 1992. (Doc. 93-2 at 175, Ex. 92.) Petitioner was not arrested until September 9, which is when police first obtained his fingerprints. Godoy learned of the fingerprint match to Petitioner the very next day. On the foodstamp, two latents matched Petitioner's right thumb—one on each side—and three latents from each bag matched Petitioner's right ring finger and left thumb and index finger. (Doc. 191-1 at 108-24 (RT 10/21/93) at 107-23; Doc. 45, Ex. 39.)

A showing of actual innocence may be used to establish the "fundamental miscarriage of justice" exception to procedurally default, thereby permitting federal review of an otherwise barred constitutional claim. To pass through this gateway, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 at 327. To establish the requisite probability, a petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id*. Such a showing is "extremely rare" and requires submission of new reliable evidence not presented at trial. *Id*. at 324.

For the reasons just discussed, the Court concludes that considering the new evidence as a whole, including the misconduct that occurred in the McCrimmon and Minnitt cases, Petitioner has not demonstrated that *no* reasonable juror would have found him guilty. Accordingly, the miscarriage of justice exception does not excuse any procedural defaults.

## IX. CLAIMS S-X: RESENTENCING ERRORS

After his capital sentences were vacated on *Roper* grounds, Pima County Superior Court Judge Munger resentenced Petitioner to three consecutive terms of 25 years to life for the murder convictions. (Doc. 216-5, Ex. 192.) Petitioner raises numerous challenges to the resentencing proceedings, all but one of which Respondents concede were properly exhausted.

### A. Aggravating Factors

In Claim S, Petitioner asserts that the resentencing court committed structural error by adopting the trial court's aggravation findings and rejecting mitigating evidence that undermined the aggravation, in violation of his rights to due process, a fair sentencing, and freedom from cruel and unusual punishment. (Doc. 229 at 2.) However, he also complains that the resentencing court made no aggravation or mitigation findings when it resentenced Petitioner. (*Id.* at 8.) In addition, Petitioner raises numerous arguments regarding the validity of the aggravating factors found during his original capital sentencing and asserts that Stuehringer's deficient representation at that time "continues to harm Mr. Fong as the same aggravating/mitigating findings were relied upon to enhance the non-homicide sentences,

which were never reconsidered by the resentencing court." (*Id.* at 19.) Finally, Petitioner argues that he was entitled to a jury determination as to the aggravating factors. (*Id.*)

On appeal from resentencing, the Arizona Court of Appeals noted that at the time of the El Grande murders, the only statutorily-authorized sentences for first degree murder were death or life without the possibility of release for twenty-five years. (Doc. 146-3 at 77, Ex. WW at 11.) Because Petitioner was no longer death-eligible and the aggravating/mitigating factors set forth in the capital sentencing statute were inapplicable, "the only remaining option was a life term of imprisonment." (*Id.* at 77-78, Ex. WW at 11-12.) The appellate court further observed that although the resentencing court had "restated the aggravating factors found when Fong was sentenced originally; the trial court did not state that it had considered those factors in resentencing Fong." (*Id.*) With regard to Petitioner's complaint that the trial court imposed consecutive sentences without explanation, the appellate court ruled that Arizona law did not require the sentencer to make aggravation or mitigation findings, or to set forth its reasoning. (*Id.* at 76, Ex. WW at 10.) Moreover, because Petitioner "received the only statutorily available sentences for the murder convictions, not aggravated terms," the Arizona Court of Appeals determined that he had no right to a jury determination of aggravating factors. (*Id.* at 78, Ex. WW at 12.)

Petitioner argues that the state court's ruling was contrary to *United States v. Tucker*, 404 U.S. 443 (1972), as well as *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The Court disagrees. In *Tucker* the Court vacated a maximum-term sentence imposed by a federal judge who had considered multiple invalid prior convictions in determining sentence. In *Ring* and *Apprendi*, the Court held that factors which aggravate a sentence must be found by a jury. These cases are irrelevant because the only sentencing decisions to be made by the state court here were whether to impose the mandatory life sentence for each murder count concurrently or consecutively to one another. In *Oregon v. Ice*, 555 U.S. 160 (2009), the Supreme Court expressly declined to extend *Apprendi* to require jury determination of any fact required by state law before imposition of consecutive

sentences. Accordingly, the state court's rejection of this claim was neither contrary to nor involved an unreasonable application of clearly established Supreme Court law. *See Musladin*, 549 U.S. at 76.

Moreover, the Ninth Circuit has held that "[t]he decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). The Ninth Circuit has also recognized that Arizona trial courts have "*absolute discretion* to impose either consecutive or concurrent sentences." *Souch v. Schaivo*, 289 F.3d 616, 623 (9th Cir. 2002) (finding no basis for habeas relief for challenge to state court's failure to list reasons for imposing consecutive sentences) (citing *State v. Garza*, 192 Ariz. 171, 174-75, 962 P.2d 898, 901-02 (1998)). Any claim that the trial court erred in imposing Petitioner's sentences consecutively rather than concurrently fails to implicate a violation of federal constitutional rights.

## B. <u>Jury Sentencing</u>

In Claim T, Petitioner argues his rights to due process, trial by jury, and to be free from cruel and unusual punishment were violated when the state court refused to empanel a jury for resentencing. (Doc. 229 at 20.) The Arizona Court of Appeals disagreed:

> Citing *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), Fong argues the court should have empaneled a jury for his resentencing. But *Blakely* only requires a jury to find "'any fact *that increases the penalty for a crime beyond the prescribed statutory maximum.*'" *Id.* at 301, 124 S. Ct. at 2536, *quoting Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000) (emphasis added); *see also State v. Brown*, 209 Ariz. 200, ¶ 7, 99 P.3d 15, 17 (2004). The "'statutory maximum' . . . is 'the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*'" *Brown*, 209 Ariz. 200, ¶ 10, 99 P.3d at 17, *quoting Blakely*, 542 U.S. at 303, 124 S. Ct. at 2537 (emphasis in *Blakely*).

> As we have already explained, the only sentence available to the trial court on resentencing was life with the possibility of release after twenty-five years. The trial court did not need to make factual findings beyond the jury's verdict in order to impose the life sentences, *see id.*; *see also Fell*, 210 Ariz. 554, ¶ 11, 115 P.3d at 597, or to order them to be served consecutively. *See* § 13-708; *Urquidez*, 213 Ariz. 50, ¶ 12, 138 P.3d at 1180. Accordingly, the court's imposition of consecutive life terms of imprisonment for the three murders did not implicate the Sixth Amendment as interpreted by *Blakely*.

(Doc. 146-3 at 80, Ex. WW at 14.)  For the reasons just discussed with respect to Claim S, the state court's determination of this claim was neither contrary to nor involved an unreasonable application of clearly established Supreme Court law.

## C.    Non-Murder Counts

In Claim U, Petitioner argues that the state court's refusal to resentence him on all counts, not just the murder counts, violated his federal constitutional rights.  (Doc. 229 at 23.)  Citing federal criminal cases, Petitioner argues that once a "sentencing package" becomes "unbundled" when part of a sentence is set aside, a court "has the discretion to resentence on all counts in order to create the appropriate punishment under the changed circumstances." (*Id.* at 25.)  In rejecting this claim, the Arizona Court of Appeals held that Arizona law precludes "unbundling" non-murder counts from murder counts when a capital sentence for murder is vacated, citing the Arizona Supreme Court's ruling in *State v. Clabourne*, 194 Ariz. 379, 390, 983 P.2d 748, 759 (1999).  (Doc. 146-3 at 79, Ex. WW at 13.)  Petitioner cites no clearly established Supreme Court authority requiring resentencing on all counts when only part of a sentencing judgment is vacated or set aside.  Accordingly, he cannot satisfy the requirements of § 2254(d)(1).

## D.    Judicial Bias

In Claim V, Petitioner argues that the resentencing judge was biased, in violation of his constitutional rights.  (Doc. 229 at 26.)  Petitioner asserts that Judge Munger "demonstrated hostility and bias towards Mr. Fong," which led him to deny Petitioner's request at resentencing to present evidence of residual doubt as mitigation. (*Id.* at 27.)  The Arizona Court of Appeals disagreed:

> After the Rule 32 status conference on April 25, 2005, Fong filed a motion for a change of judge, arguing Judge Munger had been hostile to him at the conference and ignored his claims for relief based on innocence and newly discovered evidence, when he set a resentencing proceeding based on *Roper* without entertaining those claims first.  The presiding judge denied his motion, finding "no evidence of pervasive or concentrated behavior on the part of Judge Munger to suggest bias or prejudice."

> Fong contends the record is clear that "Judge Munger was biased against [him] and hostile to his claims of innocence from the onset of second

postconviction proceedings." He cites Judge Munger's "behavior toward the defense and the Mexican Consulate at the April 25, 200[5] hearing," arguing it "illustrated his prejudice, and prevented counsel from adequately making a record in violation of [his] right to due process." He points to two adverse rulings that occurred at the hearing: Judge Munger's decisions to go forward with sentencing despite the pendency of Fong's Rule 32 petition and to strike Fong's second supplement to his Rule 32 petition. Finally, Fong states that Judge Munger's "subsequent ruling on the scope of the resentencing and the imposition of the maximum sentence . . . demonstrate" bias and prejudice.

Fong's claim of prejudice is based on Judge Munger's behavior at one hearing and his subsequent adverse rulings. He points to no other instances of allegedly inappropriate behavior during any of the remaining post-conviction or sentencing proceedings. Significantly, all of the remarks Fong challenges were directed not at Fong but at his counsel. "Recusal based on the alleged appearance of hostility between an attorney and judge, or bias by a judge against an attorney, is not warranted except in extreme or rare instances." Upon review of the transcript of the entire conference, we find no error in the presiding judge's conclusion that Judge Munger's statements revealed nothing more than "an expression of frustration" with Fong's counsel.

Furthermore, "[d]isagreements over rulings are insufficient to support recusal." In fact, two of the rulings Fong argues support his bias claim—the decisions to go forward with resentencing before ruling on Fong's Rule 32 claims and to strike Fong's second supplement to his Rule 32 petition—are not rulings he challenges in his appeal or petition for review. And, as we discuss below, the trial court's decision limiting resentencing to the murder convictions was correct and imposing those sentences consecutively was within the court's discretion. Thus, the trial court's rulings do not support Fong's claim of bias.

Fong nevertheless argues the trial court's decision to go forward with resentencing before resolving his Rule 32 claims was evidence that Judge Munger "ha[d] already drawn conclusions regarding Mr. Soto Fong's innocence and residual doubt claims." The record does not support this contention. Indeed, Judge Munger delayed ruling on Fong's Rule 32 petition because he had concluded one of his claims was potentially colorable, and he gave Fong additional time to investigate that claim. And, as Fong concedes, Judge Munger ultimately ruled on Fong's Rule 32 claims before resentencing him.

Moreover, even assuming the trial court's ruling could be interpreted as stating an opinion on the merits of Fong's claims, that would not support a claim of prejudice.

> "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."

*State v. Henry*, 189 Ariz. 542, 546, 944 P.2d 57, 61 (1997), *quoting Liteky v. United States*, 510 U.S. 540, 555-56, 114 S. Ct. 1147, 1157 (1994) (brackets in *Henry*). Accordingly, the presiding judge did not abuse his discretion in denying Fong's motion for change of judge.

(Doc. 146-3 at 71-74, Ex. WW at 5-8 (citations and footnotes omitted).)

Petitioner argues that the state court's ruling was objectively unreasonable because it "demand[ed] new evidence before it would conduct even a rudimentary analysis of the claim" and "applied the law to the facts of Mr. Fong's case in an 'ineffective and illogical' manner." (Doc. 233 at 23.) The Court finds no merit to these baseless allegations and concludes that the record supports the findings of the Arizona Court of Appeals that Petitioner failed to establish bias or prejudice on the part of the resentencing judge. (*See* Doc. 197-1 at 107, Ex. 188.) The state court's ruling was not based on an unreasonable determination of the facts or application of controlling Supreme Court law.

### E.  <u>Mitigating Evidence</u>

In Claim W, Petitioner contends that his rights under the Fifth, Eighth, and Fourteenth Amendments were violated by the resentencing court's refusal to allow him to investigate and present evidence of residential doubt as mitigation. (Doc. 229 at 28.) The Arizona Court of Appeals denied this claim on the same ground as Claim S—no findings of aggravation or mitigation were necessary because there was only one remaining sentencing option on the murder counts. (Doc. 146-3 at 77-78 & n.6, Ex. WW at 11-12 & n.6 (citations and footnotes omitted).) Petitioner asserts that the state court's ruling was contrary to *Chambers v. Mississippi* and *United States v. Tucker*, but neither case is on point. Because Petitioner has cited no controlling Supreme Court law requiring presentation of "residual doubt" evidence at a non-capital sentencing proceeding, he cannot show that the state court's denial of this claim was contrary to or an unreasonable application of clearly established federal law under 28 U.S.C. § 2254(d).

### F.  <u>Cruel and Unusual Punishment</u>

In Claim X, Petitioner argues that life-long incarceration of an innocent juvenile offender violates the Eighth Amendment's proscription against cruel and unusual punishment. (Doc. 229 at 30.) Respondents assert that Petitioner never raised in state court a claim challenging unconstitutionality of life imprisonment for a juvenile offender convicted of

homicide. (Doc. 232 at 24.) The Court need not reach this issue because Petitioner's claim is plainly meritless.

First, as already explained in Section VIII, *supra*, Petitioner has failed to establish that he is actually innocent. Second, the Supreme Court's decision in *Graham v. Florida*, on which Petitioner relies, clearly applies only to juvenile offenders sentenced to natural life for non-homicide offenses. *See* 130 S. Ct. 2011, 2034 (2010) ("The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."). Here, Petitioner was convicted of a triple homicide. Thus, *Graham* is inapposite, and Petitioner's claim fails.

## X.    CLAIM R: CUMULATIVE ERROR

Petitioner argues that the cumulative effect of the alleged errors and misconduct discussed above deprived him of due process. (Doc. 94 at 288.) Because there is no merit to any of his claims, there is no cumulative effect amounting to a denial of due process.

## XI.    CAUSE AND PREJUDICE

The Court has determined that some of Petitioner's claims are procedurally defaulted, either because Petitioner did not properly exhaust the claim or because the state court dismissed the claim on independent and adequate state grounds. Petitioner asserts a number of cause and prejudice arguments. Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753. "Prejudice" is actual harm resulting from the alleged constitutional error or violation. *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998).

Objective factors that constitute cause include interference by officials that makes compliance with the state's procedural rule impracticable, a showing that the factual or legal basis for a claim was not reasonably available to counsel, and constitutionally ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *King v. Lamarque*, 455 F.3d 1040, 1045 (9th Cir. 2006). Ineffective assistance of counsel can represent sufficient

cause only when it rises to the level of an independent constitutional violation. *Coleman*, 501 U.S. at 755. When a petitioner has no constitutional right to counsel, there can be no constitutional violation arising out of ineffectiveness of counsel. *Id*. at 752. Before a claim of ineffective assistance of counsel may be used as cause, it must first be exhausted in state court as an independent claim. *See Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000); *Carrier*, 477 U.S. at 489-90.

## A. <u>Prosecutorial Misconduct</u>

The Court determined that Petitioner's allegations of misconduct relating to the forensic evidence, access to the fingerprint examiner, and failure to investigate exculpatory leads were never raised in state court.[24] *See supra* Section I.B-C. As cause, Petitioner argues that the State concealed the factual basis of the claims, Stuehringer had a conflict of interest and was ineffective at both trial and appeal, and PCR counsel was ineffective. (Doc. 181 at 104-09.) The Court is unpersuaded.

First, the misconduct claims that were never raised in state court were readily apparent from the record and thus any alleged concealment does not serve as cause. Second, Petitioner never exhausted in state court claims of appellate ineffectiveness for failing to raise misconduct claims arising from the handling of forensic evidence, the fingerprint examiner, and exculpatory leads. *See supra* Section V. Thus, appellate counsel's alleged ineffectiveness cannot serve as cause. Third, Petitioner has failed to establish that Stuehringer had an actual conflict of interest at the time he prepared the appellate briefs in Petitioner's case. Lastly, as Petitioner acknowledges, there is no constitutional right to counsel in state PCR proceedings. *See Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1, 7-12 (1989) (the Constitution does not require states to provide

---

[24] The Court also found that various claims of alleged misconduct during the prosecutor's closing argument were found precluded on independent and adequate state grounds. *See supra* Section I.C. Subsequently, in addressing Petitioner's claim of ineffectiveness arising from trial counsel's failure to object, the Court determined that these claims are also meritless. *See supra* Section IV.B.6.

counsel in PCR proceedings even when the putative petitioners are facing the death penalty); *Bonin v. Vasquez*, 999 F.2d 425, 429-30 (9th Cir. 1993) (refusing to extend the right of effective assistance of counsel to state collateral proceedings); *but see Martinez v. Ryan*, No. 10-1001, 2011 WL 380903 (Jun. 6, 2011) (granting certiorari on issue of whether there is a constitutional right to effective assistance of postconviction counsel where postconviction first opportunity to challenge effectiveness of trial counsel); *Maples v. Thomas*, 131 S. Ct. 1718 (2011) (granting certiorari on issue of whether mistakes by postconviction counsel establish cause). Thus, the alleged ineffectiveness of PCR counsel cannot serve as cause.

Absent cause, there is no need to consider prejudice. *See Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998).

## B.  *Brady* Violations

The Court found that Petitioner never raised in state court claims alleging a failure to disclose the Fuller report, Wright notes, and reports related to alleged exculpatory witnesses.[25] *See supra* Section II.A.  As cause and prejudice for the default, Petitioner points to the lack of disclosure. (Doc. 181 at 161-63.) He also argues that Stuehringer's conflict of interest and deficient representation at trial and appeal, as well as ineffectiveness by PCR counsel, constitute cause. (*Id.* at 163-65.) The Court has already addressed and found unpersuasive the arguments based on trial, appeal, and PCR counsel.

As previously noted, to succeed on a *Brady* claim a petitioner must establish that evidence favorable to the accused was suppressed by the prosecution, either willfully or inadvertently, resulting in prejudice to the defense. *Banks v. Dretke*, 540 U.S. at 691 (citing *Strickler v. Greene*, 527 U.S. at 281-82). Establishing the suppression of evidence also establishes cause for any failure to develop a *Brady* claim in state court. *Id.* Here, Petitioner fails to allege colorable *Brady* claims; therefore, the Court finds no cause and prejudice to

---

[25] The Court also found that the state court had dismissed other alleged *Brady* violations on independent and adequate grounds, but then determined that regardless of the default the claims lacked merit. *See supra* Section II.B.

overcome the default.

According to Petitioner, the Fuller report "details how Keith Woods came to the attention of authorities, namely, by evidence inculpating him in the Mariano's Pizza robbery." (Doc. 94 at 123.) The report includes a statement from McCrimmon's sister, Zemrie Wilmore, who claimed Woods was with her brother and Minnitt at the pizzeria robbery and shot one of the victims. (Doc. 93-2 at 172, Ex. 91 at 8.) That Woods was a suspect in the Mariano's case was both known to defense counsel and brought out during Stuehringer's examination of Woods at trial. (*See* Doc. 147-2 at 20, Ex. DDD (RT 10/15/93) at 19.) Moreover, for the reasons set forth in Section II.B.3 above, there is no reasonable probability the result of Petitioner's trial would have been different had the jury learned that prosecutors chose not to seek indictment against Woods in the Mariano's Pizza case.

With regard to the handwritten notes of Detective Wright, Petitioner asserts that these are the "only contemporaneous and arguably reliable record of the evidence collection at the scene of El Grande." (Doc. 94 at 123.) He asserts the notes demonstrate that forensic item 23KW found near Fred Gee's body was a single food stamp, not two as shown in crime scene photographs and documented by identification technicians. However, defense counsel was aware of this discrepancy and had possession of Wright's written report in which she identifies 23KW as a "Food stamp coupon" (singular). (*See* Doc. 44, Ex. 8 at 4.)

Finally, Petitioner asserts that defense counsel was unaware of police reports showing "earlier contacts" with Cruz Peña Baumea and Virginia Grajeda but does not explain in either his petition or traverse how he was prejudiced by the alleged suppression. Defense counsel was aware of both of these potential witnesses. (*See* Doc. 44, Ex. 7 at 5; Doc. 93-1 at 3, Ex. 10.) Petitioner fails to provide the allegedly suppressed reports or to identify the new material information contained therein. This is wholly insufficient to state a claim for relief under *Brady* and thus the Court finds no cause for the failure to raise this claim in state court.

### C.    Ineffective Assistance of Trial & Appellate Counsel

In Section IV above, the Court found defaulted Petitioner's trial ineffectiveness

allegations identified by the Court as Numbers 4-6 and 12-15. In Section V, the Court found defaulted Petitioner's appellate ineffectiveness allegations identified as Numbers 3 and 5-8. As cause, Petitioner argues that the state PCR court failed to provide him the necessary resources to investigate and develop his ineffectiveness claims and appointed ineffective PCR counsel. (Doc. 181 at 263-64, 295.)

Because the ineffectiveness of PCR counsel cannot serve as cause, that argument lacks merit. Moreover, Petitioner concedes that he was provided investigative and expert resources during the PCR proceedings. He complains that the state court did not grant each resource request in full, but does not otherwise explain how such limitations impaired his ability to identify and raise in the PCR petition the defaulted ineffectiveness allegations presented here. The Court finds that Petitioner has failed to establish cause to overcome the default of his trial and appellate ineffectiveness claims.

### D. Failure to Change of Venue/Sequester Jury

Petitioner asserts appellate counsel's ineffectiveness as cause to excuse the failure to properly exhaust this claim. (Doc. 181 at 355.) Although this ineffectiveness claim was properly exhausted in state court, as explained in Section V.B it lacks merit. Therefore, Petitioner has failed to establish cause.

## CONCLUSION

The Court finds that Petitioner has failed to establish entitlement to habeas relief on any of his claims. The Court further finds that additional evidentiary development in this matter is neither required nor warranted.

## CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing § 2254 Cases, the Court has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability (COA). *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

COA or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court finds that reasonable jurists could debate its resolution of the following issues: Whether the prosecution knowingly suborned false testimony from Detective Godoy and whether trial counsel was ineffective for calling Keith Woods as a witness. For the reasons stated in this order, the Court declines to issue a COA with respect to any other claims or issues.

Based on the foregoing,

**IT IS ORDERED DENYING** Petitioner's Petition for Writ of Habeas Corpus and all amendments thereto (Docs. 1, 43, 92, 94, 229). The Clerk of Court shall enter judgment accordingly and close this case.

**IT IS FURTHER ORDERED DENYING** Petitioner's Motion for Expedited Deposition (Doc. 240).

**IT IS FURTHER ORDERED GRANTING** a Certificate of Appealability as to the following issues: Whether the prosecution knowingly suborned false testimony from Detective Godoy and whether trial counsel was ineffective for calling Keith Woods as a witness.

DATED this 5th day of August, 2011.

David C. Bury
United States District Judge